[Crim. No. 2214.   Second Appellate District, Division Two.—September 21, 1932.]

THE PEOPLE, Respondent, v. MORRIS MILLER, Defendant; JOE STEIN, Appellant.

Samuel L. Rummel and Kenneth K. Scott for Appellant.

U. S. Webb, Attorney-General, and John D. Richer, Deputy Attorney-General, for Respondent.

THOMPSON (IRA F.), J.—Miller and Stein were both charged with robbery. Miller pleaded guilty to one of three counts. When the taking of testimony was completed the other two counts were dismissed. Stein was found guilty and sentenced. He appeals from the judgment and from an order denying his motion for a new trial.

One, and the principal contention advanced by appellant, is that the evidence is insufficient to support the verdict. We therefore proceed to examine that question.

The Thrifty Drug Company, located at 412 South Broadway in Los Angeles, was held up and robbed of approximately $400, about 7:30 o'clock A. M. on December 14, 1931, by two armed bandits. One of the assailants was Stein's co-defendant Miller. The other was not identified and it is said that Stein is not as tall as was the man who entered the store with Miller. It must be assumed in our consideration of the case that Stein did not enter the drug-store—that if he was in fact connected with the commission of the crime, that circumstance must be established by testimony outside of the happenings inside of the store. It appears that immediately after the robbery Miller hailed a taxicab at Fourth and Spring Streets, saying to the driver that he "wanted to go straight out Temple Street" and was in a hurry. He entered the cab on the west side of Spring

Street and it continued south on that street to its intersection with Fifth Street, where it turned west and proceeded to Broadway. At the corner of the last-named street and Fifth Street Miller directed the driver to turn north, which route would carry him by the store he had aided in robbing. The driver of the cab was compelled to stop behind a street-car at Fourth and Broadway, whereupon Miller wanted to alight, but finding that the door was locked from the inside, instructed the driver to draw over to the curb. The latter could not go forward because he was inside the safety zone, and for that reason, and upon the insistence of Miller, backed up and over to the curb. Miller immediately left the cab and without paying his fare went down, or south, on Broadway, with the driver of the cab in pursuit of Miller with the hope of collecting his due. However, a few car-lengths south Miller entered an Auburn automobile parked at the curb with the appellant Stein at the wheel, which immediately started north on Broadway, but had not proceeded far until it was stopped by the officers and both Stein and Miller arrested. The cab driver, who related most of this story from the witness-stand, testified that he saw no gun. And this fact may become important as we later analyze the testimony. A witness named Maples, who worked about five doors south of the Thrifty Drug Store, testified that he was waiting outside his place of employment for the manager thereof when he noticed an Auburn coupe drive up and park. He thought there were two people in the car, and that one of them left the machine and walked up the street. The next thing he noticed was the car starting, having trouble in getting away from the curb. The driver of the car was Stein and the other occupant, Miller. The witness also observed the arrest by the officer.

The witness Kohl simply related the actions of Miller from the time he left the cab until the arrest, together with the rather important negative testimony that he saw nothing peculiar about the actions of either Stein or Miller as Miller entered the automobile. He also identified Stein as the driver.

Officer Lund saw Miller leave the taxicab and in view of the weight attached to his testimony, we quote therefrom as follows: ''The cab man was still standing in the street.

The defendant Miller had begun to look in my direction, or was looking north, and seeing me whirled on his feet and hurried south. That made me very suspicious, and I hurried. By the time I had got down to the cab, where the cab was standing, he had naturally got about 25 or 30 paces down the street, and without coming to a complete standstill I asked the cab man if he knew that fellow that just got out of his car'' (here follows an instruction to the witness not to give the conversation). ''I saw the defendant Miller hurry down the street ahead of me. Q. Yes. A. And his left hand was in his coat—overcoat pocket. As he reached an Auburn car—I didn't know what kind of a car at that time, but as he reached a car I observed a man who must have been sitting behind the wheel lean way over and open the door. I saw his face. This man in the car opened the door and before the defendant Miller had taken his seat I could hear the motor of that car, and it maneuvered back and forth two or three times before it could get away from the curb to get into the street. By this time I had pulled my gun and I went out from the parked cars into the street, running towards them and flagging them down to stop. I ran up to the car and opened the door, the defendant Miller was working frantically with his left hand near his hip pocket. I cautioned him to bring his hands out in front and to make no false move. I also cautioned the man behind the wheel, who I identify as Stein, to keep his hands on the wheel, and I asked them who they were. There was no response. I asked the defendant Stein whose car this was, and he said, 'It belongs to a friend of mine.' Q. Who said that? A. Stein. I asked him his name, he answered me but I didn't get his name to write it down. I asked him what he was doing with his friend's car, and he said he just brought his girl to work. I asked him where his girl worked, and he said, 'up the street' indicating north. I heard the siren of a police car coming at this time, and I didn't make any effort to take the man out. Then the defendant Stein about this time made a statement, he says—'Officer, this man pulled a gun on me.' So in the matter of a few seconds the police car came up and an officer came on my side, and I says 'Take this man,' indicating Miller, 'out,' which he did.'' The witness then told of finding a 32-caliber

revolver fully loaded behind the cushion where Miller was sitting and also of handcuffing Stein. On cross-examination he stated that Miller did not hesitate as he entered the Auburn car, but that the door flew open as he arrived and further that Miller did not put his hand on the door at all. He also swore that he did not see Miller make any demonstration toward the driver Stein, but that the car moved almost immediately.

Officer Gibson testified that he talked to appellant on the day of his arrest concerning the ownership of the Auburn automobile and that Stein told him that he owned it, although it was registered under the name of Charles Green; that he had to have a reference to buy a car on contract and therefore used his brother's name. Gibson also testified that he took an operator's license from appellant issued in the name of Harry Fields and that Stein replied to his query concerning the name that the licensed car belonged to him, but had been issued under that name when he had purchased a former car in the name of Fields. (Appellant did not claim that Fields was a brother of his and Green's.) Stein also told the officer that he went to the market about 6 A. M. on the morning of the robbery for the purpose of getting a load to haul to Fresno, but not being able to obtain one went to Fourth and Broadway Streets, arriving there about 6:30 A. M., in order that he might wait there for his girl, due to go to work at about 9 A. M., for the purpose of getting her to sign some papers for him to get a suit and hat at a clothing store at Eighth and Broadway. When asked by the officer why he waited at the corner for so long a time instead of going back home, Stein made no answer. The officer then testified that he went to 1144 East Twenty-fourth Street, where the appellant was living, and found a box of 32-caliber cartridges fitting the revolver found behind the cushion in the Auburn. They were not of the same make, however, as those found in the gun.

The defendant Miller testified that his partner in the actual robbery was Jack Sherman; and that he opened the door to the Auburn and forced Stein to drive it at the point of the gun which later he hid behind the cushion.

The appellant Stein, on the stand, told substantially the same story he had previously given officer Gibson, but added that before he left home that morning he had told his wife

to meet him in front of the Thrifty Drug Store and that he would be parked there and also added that after he had been sitting in his car a few minutes in front of 420 South Broadway he reached over for the electric cigar lighter with the intent to light a cigarette when Miller opened the door of the car, knocked appellant's hand from the dashboard and at the point of a gun ordered him to get going.

We have detailed the testimony more than is usual because at first blush there appeared to be considerable doubt concerning its sufficiency, but that doubt disappears as the evidence is analyzed—provided, of course, we bear in mind the test which must be applied in the appellate tribunal, which is whether there is substantial testimony to support the verdict and not whether from the printed page we might be inclined to a different conclusion. If the jury believed, and they undoubtedly did, the testimony of the arresting officer Lund they were fully justified in determining that Miller did not enter Stein's car and compel him to drive at the point of a gun. It is hardly conceivable that one trained to observe, as are the officers of the law, would not have seen the threat with the gun. But more than this, he testified positively that appellant reached over and opened the door—and even before Miller had taken his seat had started the motor. Stein's recital of what happened cannot be reconciled with Lund's version. The testimony of the witness Maples, while not as certain or precise as that of the officer, tends to corroborate the latter. Maples thought two men drove up in that Auburn car—giving that, of course, as his best recollection. However, this witness made an affidavit on the motion for a new trial in which he was of a different opinion. So does the testimony of the witness Kohl, who saw Miller enter the automobile, but noticed nothing out of the ordinary in the actions of either Miller or Stein. The jury undoubtedly considered what the ordinary citizen would say at the very first opportunity if he were compelled to drive someone in his car at the point of a gun. A careful reading of the testimony makes it plain that appellant did not complain at the first opportunity, but only after he had had a chance to contemplate the evidence of guilt which was rapidly closing around him. The finding of the 32-caliber cartridges is perhaps of slight

weight—yet it is entitled to consideration. The story of the registration certificate and the operator's license fails to carry with it the note of sincerity and so does the other concerning the unusually long period of waiting by the appellant near the front of the drug-store for his wife, although he testified he had planned to get a load for Fresno. We feel that the jury was fully justified in concluding that Stein was the confederate of Miller and Sherman, and that he was in charge of the car, ready to aid and assist them in their getaway. Had appellant been an innocent friend or acquaintance of Miller he would undoubtedly have given that version of the affair from the witness-stand rather than the one which the jury did not credit with truth.

Complaint is made by appellant of the instruction given by the trial judge upon the subject of character testimony and his refusal to give an instruction requested by appellant in regard thereto. The instruction given reads as follows: ''Evidence of good character is no excuse for the commission of a crime, if you believe that notwithstanding such character the defendant is the guilty party; but in determining the question of whether or not he is guilty, it is proper for you to consider such evidence, along with all other evidence brought out in the case.'' Appellant insists that the trial judge by this instruction commented upon the evidence and in fact made an attack upon the character testimony. He also argues that the instruction leaves out of consideration the element of ''reasonable doubt''. We find ourselves unable to agree with these assertions. In the case of *People* v. *Kalkman,* 72 Cal. 212 [13 Pac. 500, 503], an instruction was proposed as follows: ''Proof of such good character may be sufficient to justify an acquittal, although without it no acquittal would have been had.'' The trial judge modified the proposal by adding the words: ''unless in spite of such good character, the evidence yet convinces you beyond a reasonable doubt of defendant's guilt.'' It was held that the instruction as modified was not erroneous and there was cited by the court in support of its position an instruction given in the case of *People* v. *Samsels,* 66 Cal. 99 [4 Pac. 1061], as follows: ''If you should believe the defendant guilty, you must so find, notwithstanding his good character.'' In the case of

*People* v. *Von Perhacs,* 20 Cal. App. 48 [127 Pac. 1048, 1050], the court modified a proposed instruction regarding character testimony by adding the language: "If you are satisfied to a moral certainty and beyond a reasonable doubt that the defendant is guilty as charged in the information herein, it will be your duty to so find him, notwithstanding such evidence of good character." It was said by the appellate court that: "The instruction as modified by the court correctly and without conflict stated the law." To the same effect see: *People* v. *Soto,* 63 Cal. 165. We had occasion in the case of *People* v. *Harris,* 80 Cal. App. 328 [251 Pac. 823], to somewhat review the law upon the subject and while we reversed that case, a reading of the opinion will demonstrate that the instruction given here does not do violence to the rule which prohibits the court from commenting upon the facts. Nor do we believe that the instruction can reasonably be construed as leaving out of consideration the element of reasonable doubt. The jury was instructed fully upon that question. And it is a familiar rule that the instructions must be read together. Perhaps it would have been better and more in keeping with the suggestions heretofore made to trial courts to give instructions which have become practically standardized (see *People* v. *Heuss,* 95 Cal. App. 680 [273 Pac. 583]), had the instruction been couched in the words found either in the case of *People* v. *Von Perhacs, supra,* or in *People* v. *Mitchell,* 129 Cal. 584 [62 Pac. 187], but it is not fatally subject to the criticism leveled against it. The appellant did propose an instruction in the words of the one given in *People* v. *Mitchell, supra,* and as follows: "You are instructed that the defendant Joe Stein has introduced before you evidence tending to show his good character for peace and quietness, and for honesty, integrity and truthfulness. If in the present case, the good character of said defendant is proven to your satisfaction, then such fact is to be kept in view by you in all your deliberations, and it is to be considered by you in connection with the other facts in the case; and if after a consideration of all the evidence in the case, including that bearing upon the good character of the defendant Stein, the jury entertain a reasonable doubt as to defendant Stein's guilt, then I charge you it is your duty to acquit him. But if the evidence convinces you beyond a reasonable doubt of defendant's guilt you must so find,

notwithstanding his good character.'' What we have heretofore said concerning the contention that the instruction given upon the subject was erroneous disposes of appellant's argument that the failure to give the proffered one was also error.

Two instructions relative to the subject of circumstantial evidence offered by the defendant were not given by the court and this is made the basis of appellant's next complaint. It is not possible, however, to support his contention for two reasons, the first of which is that the evidence in this case is not wholly and solely circumstantial (see *People* v. *Raber,* 168 Cal. 316 [143 Pac. 317]), and the second is that instructions tendered were not a full and correct statement of the rule of law. This is sufficient to justify the court in refusing to give the tendered instructions.

It is next argued that the court committed error when it instructed the jury as follows: ''The court further instructs the jury that it is the law of the state, that all persons concerned in the commission of a felony, whether they directly committed the acts constituting the offense or aided and abetted in its commission, though not present, shall be prosecuted, tried and punished as principals.'' It is asserted that this instruction is faulty because it left out the words ''or not being present have advised and encouraged its commission''. It is difficult to understand how the appellant could have been injured by the omission of the quoted words. It certainly required, if anything, a higher degree of proof by the prosecution to show that the appellant, though not present, had aided and abetted in the commission of the crime than it would have necessitated to show only that he had advised and encouraged its commission.

Complaint is made of the reception of certain of the evidence. We have examined the specification in this regard and have found no error of which the appellant may properly complain. It would serve no useful purpose for us to lengthen an opinion which has already reached more than ordinary proportions.

Judgment and order affirmed.

Craig, Acting P. J., and Stephens, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on October 6, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 20, 1932.