[Crim. No. 5603. Second Dist., Div. One. July 16, 1956.]

THE PEOPLE, Respondent, v. REYES MORIEL SILVA et al., Defendants; RUEBEN RAMIREZ HERNANDEZ, Appellant.

Sam Bubrick for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

FOURT, J.—In an amended information filed by the district attorney of the county of Los Angeles, the appellant, together with Reyes Moriel Silva, was accused of the crime of robbery. It was alleged that the defendants, on or about August 5, 1955, forcibly took from the person and immediate presence of John Mrotek, $40 in money by means of force

used upon Mrotek and by putting him in fear, and that at the time of the commission of the offense the defendants were armed with a deadly weapon. Two prior felony convictions for burglary were charged against the appellant and two prior felony convictions were charged against the defendant Silva, one in burglary and one in robbery.

Appellant entered a plea of not guilty and denied the prior felony convictions. Subsequently, a jury trial having been waived, the court heard evidence presented on behalf of the People and on behalf of the defendants. At the trial the prior convictions were admitted by the defendants. The court found Silva guilty of robbery and fixed the degree as first degree and found that he was armed with a deadly weapon in the commission of the offense. As to the appellant, the court found him guilty of the crime of robbery and fixed the degree as first degree and found that he was not armed at the time of the commission of the offense.

A motion for a new trial and probation was denied and appellant was sentenced to the state prison for the term prescribed by law, the sentence to run concurrently with the unexpired portion of any term on which the appellant was then on parole. This appeal was taken from the judgment and from the order denying the motion for a new trial.

John Mrotek, the victim, testified in substance that he was employed in a liquor store in Los Angeles County and at about 11:40 o'clock p.m., on August 5, 1955, a man identified as Silva came into the store with a handkerchief over his mouth and pulled out a gun, which appeared to be a .45 automatic, and pointed it at him and said he wanted the money; whereupon, Mrotek, being afraid, gave $38 in money and a pint of liquor to the robber. He stated further that the robber arrived by automobile which, when it stopped, was two or three doors down the street from the liquor store; that he secured the number of the automobile and wrote the same down. The victim could see two heads of persons in the automobile as the same pulled away from the store. He also identified a picture of the automobile.

Preston L. Newman, a deputy sheriff of the county of Los Angeles, testified that he was one of two officers who investigated the robbery and that he was present at the conversation had between the appellant, Officer Thompson and himself on or about August 6, 1955, at about 7:30 o'clock p.m. The witness Newman was asked to relate the substance of the conversation in question and thereupon stated:

"A. At that time Mr. Hernandez was asked if he knew what he was there for.

"He said yes, he already knew about it and knew we were looking for him and that he had started to the Sheriff's office to turn himself in when he had been arrested.

"I asked him if he would then tell us what happened the preceding night. He stated that he would.

"He stated that at approximately 8:00 to 8:30 he had gone to Johnny's Bar at Third and Downey Avenue, East L. A., where he had met with the defendant Silva.

"At that time they had a couple of girls and were going to go out with them, but that he had had his old car and that he had left the girls there—that they had left the girls there—he had driven to his home where he had borrowed a car that was being used by his brother.

"Q. Did he describe that car to you? A. I asked him at that time if that was the car that had been worked on—was being worked on at Gills Auto Body Works. He stated yes, that was the one, he said, 'That was the one that my brother had brought it home for the evening.'

"Q. Did you have occasion to examine that car at Gills Auto Body Works? A. I did.

"Q. Is that the car shown in the photograph, People's Exhibit 1? A. Yes, sir.

"Q. Will you go on with the conversation, please. A. He stated that they had gone back to the bar at Third and Downey Road, at which time they had found that the girls had left; that they had waited around there, had a couple of drinks and then had started cruising around.

"That he had felt that he was getting thirsty. They had pulled up to the front of this liquor store on Atlantic.

"I asked him if he meant 240 South Atlantic. He stated he wasn't sure of the exact address, but it was right close to Third and Atlantic.

"I asked him what had happened when he pulled up there. He stated 'Silva said, "let me show you how to pull a job."' And that he had pulled a gun out of the waist band of his pants and Hernandez then said, 'I grabbed his arm and told him "No dice, the only thing you will show me is how to get back in the joint, I don't want to pull any job with you or any other body."'

"He said, 'I sat and argued with him a few moments and he finally relaxed and said, "O.K." and I let go of his arm and he jumped out of the car and went into the liquor store.'

"I asked him if at that time he knew Silva was going to hold up the liquor store and he said, 'Well, I figured he was.'

"I asked him then if he thought he was going to hold up the liquor store why he didn't pull away and leave him and he said, 'Because the man had already saw the car; he was standing on the sidewalk when we pulled up, and it was too late then to leave.'

"I asked him what had happened when Silva had come back and got in the car. He stated that—'He says, "have a drink" and handed me a bottle of whiskey. I told him no, I didn't want one and I started to pull away and after I just started to pull away he said, "Get going, I just held up that place."'

"Q. Is that the substance of the conversation? A. I asked him then where he had gone, and he stated that they had gone north on Atlantic and turned west on Olympic and had gone back over to Third and Downey Road, East Los Angeles, where he had spent a couple of hours; had left the defendant Silva there and had returned to his home. That is substantially the conversation.

"Q. Now, did Hernandez indicate to you that he was referring to the defendant Silva—— A. He referred to him as 'Palon.'

"Q. Did Hernandez indicate to you that he was referring to the defendant Silva when he used the word 'Palon'? A. Yes.

"Q. Did you ask Hernandez whether or not he got any money? A. I asked him that, and he said, 'No, I didn't get any, I didn't want any of it.'

"Q. That is the substance of the conversation? A. Yes, sir."

CROSS-EXAMINATION

"Q. (By Mr. Brubrick): In relating this conversation with Hernandez, one part in particular, you testified that Hernandez told you that he grabbed Silva's arm and told him he didn't want to be involved in any robbery with him or anybody else, or words to that effect? A. Yes.

"Q. Do you recall asking Mr. Hernandez whether Silva then put the gun back in his waist band before Silva got out of the car? A. No, I believe he said, 'I argued with him for a few minutes and he said, "O.K. forget it" and then I relaxed my hold and he got out of the car.'

"Q. You asked him why he didn't get away? A. Yes.

"Q. And you asked him whether he knew that Silva was going to pull the job or something of that nature? A. Yes, sir.

"Q. And he said that he figured he would? A. That is right.

"Q. Now, did you ask him whether he knew definitely at that moment whether Silva had planned to commit the robbery? A. No.

"Q. In other words, he didn't tell you 'I knew he was going to do it anyway,' or anything of that nature? A. No.

"Q. He just said he thought Silva might go through with it? A. Yes.

"Q. And he had been there and his car had been observed and he just sat there? A. That is right.

"Q. Did he also say that he didn't know that Silva had pulled the job? A. Not until they pulled away.

"Q. He said that he only knew the job had been pulled after Silva got in the car and told him? A. Yes.

"Q. And up until then he said he didn't know whether the job had been pulled or not? A. That is correct."

Silva testified in substance that he knew nothing about the liquor store in question; that he had never been there; that he did not hold the place up; that he did not have a bottle of whiskey in his possession at any time on the night in question, and further that he was not even in the company of Rueben Hernandez.

The appellant did not take the witness stand.

The appellant contends that "The verdict returned in this cause is contrary to the evidence," and further contends that the prosecution is bound by the extrajudicial statements of appellant which were introduced by the People, and further that the appellant never had any criminal intent at the time he stopped near the liquor store with Silva. He further sets forth that the intent to rob was in the mind of Silva and appellant was just a victim of circumstances.

The complaining witness was held up and robbed of a sum of money and some liquor by a man identified as the defendant Silva who was armed with a gun. The money and property were obtained while the victim was in fear. A gun having been in the hand of one of the participants, all concerned therein are guilty of robbery in the first degree. (*People* v. *Perkins,* 37 Cal.2d 62, 64-65 [230 P.2d 353]; *People* v. *Lewis,* 140 Cal.App. 475, 477 [35 P.2d 561].)

In commenting upon the evidence at the conclusion of the testimony, the judge said, among other things, the following:

"THE COURT: . . . I followed my usual practice of observing the witness upon whose testimoney this case ultimately

depends as to Silva to observe somewhat the nature of the man, whether he was vindictive or anxious to get somebody that he thought had robbed him or anything of the kind. He seems a very self-contained sort of man and a very careful witness.

. . . . . . . . . . . . . . .

"It is true that all we have for Hernandez is his statement to the officer and his description of the participant in the matter which he indulged in. That is corroborated by the victim, but they stopped along in front of his place and he explains—Mr. Hernandez explains why they stopped—that they were arguing about holding the place up and that Mr. Silva finally after Hernandez having relaxed his hold on Silva, left the car, and I think his expression was that he supposed or believed that he was going to hold the place up, and he says that the reason he didn't drive away was because they had been observed. I don't see just exactly the significance of that, because all the victim could have done was identify the car so far as he knew.

. . . . . . . . . . . . . . .

"THE COURT: This is a first degree robbery. Silva, according to the proof entered the premises and secured the money and was armed. Hernandez was sitting in the car out in front and his story is that he didn't know a robbery was going to be committed, but he did participate somewhat in the proceeds.

. . . . . . . . . . . . . . .

"THE COURT: That is all Hernandez's story, which I cannot say is entirely true. He was in the car and he waited until Silva committed the crime and then he drove away with Silva."

The evidence shows that there were two men acting in concert to effect the robbery. Section 31 of the Penal Code provides, "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet its commission, or, not being present, have advised and encouraged its commission, and all persons counseling, advising, or encouraging children under the age of fourteen years, lunatics or idiots, to commit any crime, or who, by fraud, contrivance, or force, occasion the drunkenness of another for the purpose of causing him to commit any crime, or who, by threats, menaces, command, or coercion, compel

another to commit any crime, are principals in any crime so committed."

It has been consistently held that one who was present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of approach of anyone seeking to interfere, or to take charge of an automobile and to keep the engine running and to give direct aid to others in making their escape, is a principal in the crime committed. Any one of the above purposes mentioned would be sufficient upon which to base a reasonable inference that appellant, as the driver of the automobile, was aiding and abetting in the commission of the particular robbery. (*People* v. *Wilson,* 93 Cal.App. 632, 636 [269 P. 951]; *People* v. *Jaggers,* 120 Cal.App. 733, 735 [8 P.2d 206]; *People* v. *Moe,* 116 Cal.App. 740 [3 P.2d 354, 4 P.2d 234]; *People* v. *Hopkins,* 125 Cal.App. 457, 459-460 [13 P.2d 975].)

One who stays in an automobile and enables those who are robbing to make a successful "getaway" is as much a principal and aids and abets the crime as completely as though he were present and assisted in the actual taking of the property. (*People* v. *Benton,* 32 Cal.App.2d 407, 409-410 [89 P.2d 1089]; *People* v. *Soffer,* 34 Cal.App.2d 301, 304 [93 P.2d 183].)

The identification of the appellant as one of the participants in the crime was sufficiently established by means of his statement and admission to Deputy Sheriff Newman. (*People* v. *Meacham,* 84 Cal.App.2d 193, 200-201 [190 P.2d 262]; *People* v. *Gilpin,* 38 Cal.App.2d 24, 25-26 [100 P.2d 356].)

The admission of appellant placed him at the scene as the driver of the getaway car. The question of whether or not a person who was present at the time and place of the commission of a crime has aided and abetted therein is one of fact for the trier of fact to decide from all of the circumstances proved. (*People* v. *Wilson, supra,* 93 Cal.App. 632, 636.)

We believe that the case of *People* v. *Acosta,* 45 Cal. 2d 538 [290 P.2d 1], disposes of appellant's contention that the plaintiff was bound by the testimony concerning appellant's explanation of his activities on the night in question. The court, in the case cited, said at pages 542-543:

"The sentence in the Salaz case which, according to defendant, should be applied to the present case, does not stand for a rule of law that a defendant cannot be convicted if the

prosecution introduces *some* evidence which tends to prove that defendant did not act in the manner or have the state of mind which is necessary to constitute a crime and there is other evidence sufficient to show guilt. As the Salaz case itself indicates, if there is prosecution evidence which tends to disprove criminality and other prosecution evidence which tends to prove criminality, it is the function of the trier of fact to determine which version is to be believed. (Citing cases.) The court may sometimes say that the prosecution is 'bound by' extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt. (Citing cases.)"

In *People* v. *Martina,* 140 Cal.App.2d 17, at pages 23-24 [294 P.2d 1015], pertinent discussion relevant to the instant issue is found. In that case the court said:

"Defendant places great emphasis upon his unsworn statement that he had blacked out. He also had stated that he had previously suffered a head injury and on a prior occasion had also blacked out, and contends that as these statements were introduced by the plaintiff, such statements conclusively establish that if defendant committed the crime he did it while he was not conscious of his acts. In the first place, the mere statements, 'I don't remember,' or 'I can't recall' are not sufficient to establish unconsciousness at the time of the commission of a particular act. But assuming that they were, the rule is not that statements of a defendant introduced by the prosecution are completely binding on the prosecution and fully establish their truth. They are binding on the prosecution and establish their truth only in the absence of proof to the contrary (citing cases) and such statements may be contradicted by circumstantial evidence alone (citing case). Even testimony of a defendant under oath as to lack of consciousness may be overcome by circumstantial evidence. (Citing case.) Here from the circumstances of the case the jury could (and undoubtedly did) conclude that defendant's actions were normal actions and that defendant was conscious of his acts."

In *People* v. *Marks,* 111 Cal.App.2d 357, 359 [244 P.2d 771] the court said:

"The prosecution is not bound by the statement of defendant to the officers that the pieces of paper were his system for selecting horses, as he argues. It taxes one's credulity to

believe that owe sheets could be part of a system to pick winners. It is only when there is no proof to the contrary on the subject that the prosecution is bound by a statement of an accused which it introduces in evidence. (Citing case.) There was not only proof to the contrary here but defendant by his refusal to explain his system in effect admitted that he had no system."

The evidence in this case demonstrates that there were two men in the automobile used to transport the robber. The escape of the robber was effected by means of the automobile. Appellant placed himself as the driver of the car with knowledge of the perpetration of the robbery. Appellant said that "he figured" Silva was going into the store to rob. He remained in front and when Silva returned from the store and said "Get going, I just held up that place," appellant drove away and remained with the robber for a considerable time thereafter with knowledge of what had occurred in the store. The court very properly concluded that appellant was a principal in the robbery.

On appeal the reviewing court will not attempt to reweigh the evidence but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the trier of facts to warrant the inference of guilt. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Gould,* 111 Cal.App.2d 1, 5 [243 P.2d 809].)

The judgment and order denying the motion for a new trial are, and each is affirmed.

White, P. J., and Doran, J., concurred.