[Crim. No. 1493. Fourth Dist. Jan. 19, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. JAMES HARRELL KING et al., Defendants and Appellants.

334

Max Lercher, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

GRIFFIN, P. J.—Defendants and appellants James Harrell King, Frank Clayton, Edward Bullock and George Reddic, were charged with and convicted of the crime of robbery (Pen. Code, § 211). The appeals by Clayton and Reddic were dismissed after motion made under rule 17(a), Rules on Appeal. All defendants were charged in count one with and convicted of robbery of Clem Ellis, of B and N Market, on December 7, 1960. It was charged and the jury found that Clayton and Bullock were both armed with deadly weapons at the time. In a second count, Bullock was charged with Clayton of robbing Catherine Miller, of Miller's Market, on November 30, 1960, and it was alleged that each defendant was armed with a deadly weapon. In a third count, Bullock and King were charged with robbery of Ernest Roberson, of Robison's Liquor Store, on November 30, 1960, and it was further charged that Bullock was armed with a deadly weapon. Defendants King and Bullock were charged with prior felony convictions, which

were admitted. Bullock and Clayton were found guilty as to count two and of being armed as charged. Bullock was found guilty of count three while armed, and King was found not guilty as to count three. King appealed from the judgment and Bullock from the judgment and order denying new trial.

As to defendant Bullock, who appealed in propria persona, his counsel at the trial was appointed by this court to represent him on appeal. He filed a memorandum in lieu of a brief and stated that he believed the evidence was sufficient for conviction as to Bullock and that he was unable to point to any error in the rulings of the court. As to defendant King, however, he claims the evidence was insufficient to justify the verdict. (Citing such authority as *People* v. *Draper,* 69 Cal.App.2d 781, 786 [160 P.2d 80].)

A résumé of the evidence produced as to count two shows generally that on November 30, 1960, Catherine Miller was in her store alone at about 8 p. m.; that two Negro men entered it; that Clayton had a gun and Bullock held something at her back and ordered her to open the cash register; that they took $465 from the cash register, including Mrs. Miller's billfold, driver's license and social security card; that they put the loot into a paper bag and when Mrs. Miller started to telephone the police one defendant said "rap her," and at that time the other defendant hit her over the head with a hard object. She later made positive identification of these two defendants.

The evidence as to count three shows that at about midnight on November 30, two Negro men entered Robison's Liquor Store. One had a gun and demanded "money." Roberson said, "Seems like I know you guys." One defendant demanded the money and threatened to kill him. He took the money out of the register. Roberson later identified Bullock as the man with the gun and said he was not sure whether the other man was Clayton or King. The evidence as to count one disclosed that on December 7, three Negro persons entered the B and N Market at about 2:30 p. m. at a staggered distance apart. One defendant said it was a "stick-up" and a gun (.32 or .38 caliber blue steel, short-nosed revolver) was pointed at Clem Ellis, who identified Bullock as one of the participants. He said the other two were Reddic and Clayton, who held the gun. Money was taken from the cash register. Coins were taken which were wrapped in wrappers with the notation "S. Beasley, 3545 40th Street, S. D." on them. Ellis said that a woman of that name had brought coins so wrapped to Ellis'

store. Oren Hunt, who was at the meat counter, identified Clayton and Bullock and said he had seen King in the store several times about seven months prior to this occasion, and that he saw Bullock in there a week or 10 days before the hold-up. After they left, Hunt called the police, and Ellis tried to find the defendants. A few blocks away Ellis came upon a suspicious looking car, checked it and obtained the license number. He saw three Negro persons in the car and obtained a profile look at the driver, whom he later identified as being defendant Bullock. He determined that the car was either a Chrysler or De Soto, green in color, and the license number was JDR-646. The police were called.

At about 2:30 p. m. on December 7, a woman living across the street from the B and N Market noticed three male colored persons going toward the store. They were dressed in dark clothing. A few minutes later she saw two of them leaving the store and the third one later caught up with them. They all walked rapidly down the alleyway and got into a two-door car which was painted green. She saw someone sitting in the driver's seat and another person in the back when the three men got into the car. She was later shown a Buick and a Chrysler by the police and she said the Buick looked similar to the car she first saw in the alley.

About 2:30 that afternoon, one Richard Davis, who lived near the market, noticed three young colored men come out of the alley and head for the store. He recognized Bullock and Reddic as two of the men and as he passed the car he noticed that the engine was running. One man was seated behind the wheel and one was seated in the rear seat. He said the Negro driver had broad shoulders and that the car was a 1954 or 1955 Buick sedan, bluish in color and white on top.

A police officer was driving around about 3 p. m. after receiving a report of the robbery and the license number of the car. He noticed a Buick car bearing license number JAJ-124 and also a Chrysler bearing license number JDR-646 in a parking area near a three-unit apartment building. Two women drove away in the Buick. Just then a man (defendant King) and a woman carrying a child came out of an apartment and walked toward the Chrysler. The officer blocked the passageway and, upon questioning, King said he was the owner of the Chrysler and the woman was an occupant of one of the apartments in the building. The officer felt the radiator of the Chrysler and it was still hot. He told King that that car was reported as being used in an armed robbery and asked per-

mission to search it. King said he was the only person who had been driving the car; that it was his and it had been in the shop for repairs; that he had taken it from the shop either the evening before or that morning and he had been the only one driving it that day; and that he had parked it there about 20 minutes before. The woman stated that her brother was in her apartment with three or four friends. She accompanied the officer to the apartment, tried the door and it was locked. She knocked and also called to her brother to open the door. The officer then knocked and said "This is the police. Open up." There was no response and the door was forced open by him. Out of the presence of the jury, the officer testified that he had no warrant for search of the apartment or for the arrest of anyone; that King told him he was on parole for a narcotics offense and the woman said she had just come from the apartment and these persons were there at the time. She testified that she gave no permission to the officer to enter the premises. Some complaint is made as to unlawful search and seizure and no probable cause to arrest.

After forcing the door, the officer found defendant Reddic, with another man, in a closet hiding behind clothing. Bullock was hiding in another closet. Two coin wrappers were found floating around in the toilet bowl in slight motion. One had the name "S. Beasley" on it. An electric adding machine was found in a rear bedroom. Several cartridges were found on defendant Clayton, in his right front pocket. They were capable of being fired in a .38 caliber snub-nosed revolver. Clayton had a money clip with $86 in it. Defendants were taken into custody. Later that day, King said that he and the woman had purchased the Chrysler car a week before and he had driven it that day in the Logan Heights area; that he had gone to the store two times and had just returned and was going to take the woman over to her cousin's home and that he had not loaned his car to anyone that day. The next day, an officer explained to King that his car had been identified as being near the site of an armed robbery the day before, and he was asked if he wanted to change his story. King then said that he had been in Logan Heights and picked up Clayton on the street and that he (King) was on his way to collect a five-dollar bet; that Clayton asked to borrow the car; that Clayton agreed to return in 45 minutes but did not return; that he (King) walked to his home, about 10 blocks away, and his car was then out in front of the apartment and the other defendants were in the apartment.

King, after awhile, asked if the officer would disregard the prior statement and said he wanted to make another one. He then said that he met Clayton at 39th and Logan and Clayton asked him to pick up two friends from Los Angeles in the East San Diego area about 2:30 that afternoon; that Reddic and Bullock came up to the car and got in and the men said "Let's go to Carleen's house" and that they then went there. He denied knowledge of the robbery. The next day King was asked to point out the route he took after picking up the two men and he described it in detail.

Bullock said that he and Reddic came from Los Angeles that day and arrived about 2:15 p. m. and that they were met at the bus depot by one Charles Reed (one of the men found in the apartment) and they all took a cab to the apartment described and played dice, and when the police came they hid in the closets. He denied knowledge of the robbery and said that he had not been in the East San Diego area.

Neither Bullock nor King took the stand to testify at the trial. The conclusion that the evidence as to Bullock was sufficient to support his convictions is warranted. (*People* v. *Thompson*, 147 Cal.App.2d 543, 546 [305 P.2d 274]; *People* v. *Diaz*, 160 Cal.App.2d 123, 133 [324 P.2d 887].)

As to King, it is true that neither Mr. Ellis nor Mr. Hunt identified King as one of the three men who entered the market, but there is evidence that he aided and abetted in the get-away. The facts show that there was a get-away car parked nearby in the alley with the engine running; that a Negro was seated in the driver's seat and another person was in the back seat; that the three who did perpetrate the crime ran to this car and it proceeded immediately up the street and was pursued by the victim, who identified one of the robbers driving King's Chrysler and heading toward the place where both cars were found by the police. King was arrested as he was endeavoring to leave in his car. The robbers were found in his apartment where he resided with his fiancée and one had cartridges in his possession, and in the toilet bowl were found wrappers which the jury could well have believed came from the store and cash register that was robbed. King had been a customer of the store and was well acquainted with the premises. When interrogated, he made a series of conflicting statements.

One who drives a get-away car, knowing he is aiding in the commission of a robbery, is guilty as a principal. (*People* v. *Guidi*, 164 Cal.App.2d 680, 682 [330 P.2d 885].)

King finally admitted that he had picked up the robbers and removed them from the area of the crime, but claims he had no knowledge of the crime.

"Few criminals would ever be convicted if their explanations were accepted as gospel truth." (*People* v. *Jaggers*, 120 Cal.App. 733, 735 [8 P.2d 206].) False and inconsistent statements of an accused indicate a consciousness of guilt. (*People* v. *Cooper*, 81 Cal.App.2d 110, 117 [183 P.2d 67]; *People* v. *Armendariz*, 141 Cal.App.2d 608, 611 [297 P.2d 79]; *People* v. *Griggs*, 114 Cal.App. 133, 135 [299 P. 555].) The failure of the accused to testify becomes significant where there is incriminating evidence that he might explain or deny by his testimony. The jury may consider his failure to so testify as tending to indicate the truth of such evidence and that the inferences unfavorable to defendant are the more probable. (*People* v. *Adamson*, 27 Cal.2d 478 [165 P.2d 3].) We conclude that the evidence and the surrounding circumstances, when examined with care, adequately justify the jury's conclusion that defendant King participated in the crime. (*People* v. *Miller*, 126 Cal.App. 162, 167 [14 P.2d 342].) Probable cause for the arrest and search was shown. There was no unlawful search and seizure. The evidence was properly received. (*People* v. *Newland*, 15 Cal.2d 678 [104 P.2d 778]; *People* v. *Dewson*, 150 Cal.App.2d 119 [310 P.2d 162]; 44 Cal.Jur.2d sec. 44, p. 356; *People* v. *Tarantino*, 45 Cal.2d 590 [290 P.2d 505]; *People* v. *Roberts*, 47 Cal.2d 374 [303 P.2d 721].)

 Some mention is made about a request made at the beginning of the trial by counsel for Reddic (which request was denied) to "exclude all parties from the courtroom" under Penal Code, section 868, *People* v. *Prizant*, 186 Cal. App.2d 542 [9 Cal.Rptr. 282] and *People* v. *Elliott*, 54 Cal.2d 498, 504 [354 P.2d 225]. This section of the code and the authority cited appear to be applicable to committing magistrates. Counsel for defendants King and Bullock indicated that it was not important to their clients that the public be excluded but felt that if the motion pertained to witnesses it might be important. Exclusion of the public at a trial is discretionary with the trial court. (Code Civ. Proc., § 125; *People* v. *Hartman*, 103 Cal. 242 [37 P. 153, 42 Am.St.Rep. 108]; *Kirstowsky* v. *Superior Court*, 143 Cal.App.2d 745 [300 P.2d 163].) The matter of exclusion of witnesses is a matter within the sound discretion of the trial court. (*People*

v. *Lariscy,* 14 Cal.2d 30 [92 P.2d 638].) No abuse of discretion appears.

Judgments and order denying new trial affirmed.

Shepard, J., and Coughlin, J., concurred.

The petition of appellant James Harrell King for a hearing by the Supreme Court was denied March 14, 1962.