[Crim. No. 3892.   First Dist., Div. One.   Sept. 3, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. RICHARD T. MASTERS, Defendant and Appellant.

Robert M. Brilliant, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

### Question Presented

MOLINARI, J.—On this appeal from a judgment of conviction for armed robbery, and from the order denying a motion for new trial, the sole question presented is whether the trial court erred prejudically in failing to instruct the jury on circumstantial evidence.

### The Record

The instant appeal is by Richard T. Masters (hereinafter referred to as "Masters" or "appellant"), who was charged jointly with Harry R. Feuersinger (hereinafter referred to as "Feuersinger") and Peter A. Lucero (hereinafter referred to as "Lucero") of violating Penal Code section 211 (armed robbery).

On May 26, 1960, at about 9 p.m., Feuersinger entered the Countryside Market in San Jose, pulled a revolver on the owner, Enrico Benassi, and said to him " 'This is it. Reach into the register and give me the money.' " Benassi turned over approximately $475 to Feuersinger, who, after telling Benassi to lie down on the floor, went out the front door. Allan Breakwell, one of Benassi's clerks with whom Feuersinger had conversed upon entering the store, was attracted by a flash of silver on an electric eye beam. He went to the front of the store, saw Feuersinger go out of the door, and followed him outside. There he observed Lucero standing near the store entrance. Lucero looked at him, paused

momentarily and then ran around the store building. Breakwell then ran back into the store to call the police. He dialed the phone, which was then taken by Benassi, and went back outside the store where he observed an automobile moving slowly away with the door on the passenger side open. The clerk observed a man in the driver's position and two men, whom he identified as Feuersinger and Lucero, getting into the car which then proceeded to move away at a rapid rate of speed in a northerly direction along King Road. With respect to the route taken by the car after it sped from the Countryside Market, Masters testified that he drove on King Road and turned into another road which led into the Bayshore Highway. Shortly after entering the Bayshore Highway and travelling a short distance thereon, the said automobile was observed by Police Officers Burroughs and Wells, who were in a police patrol car. The officers had received a radio call concerning the market robbery and a description of the automobile involved shortly before, at approximately 9 p.m. The automobile had been described as a "49 to 51 or 52 Buick, white in color."[1] The police gave chase with the police car siren and red lights turned on. After a chase of about four blocks the Buick stopped. As the officers approached the car they observed three persons in it. Feuersinger got out and then the Buick again suddenly sped off, with the police car driven by Officer Wells in pursuit. Shots were fired at the Buick and after a chase of about four blocks the Buick stopped. Wells observed a man get out on the passenger side and run into a nearby open field. Masters got out from the driver's side with his hands in the air. While being searched Masters volunteered the statement that he did not "have the heat on him."[2] A later search by another officer of the area where Masters was apprehended resulted in the apprehension of Lucero, who was lying down in a depression surrounded by weeds. Feuersinger had, in the meantime, been handcuffed and searched by Officer Burroughs. This search disclosed an empty shoulder holster and a quantity of currency on Feuersinger's person. At the time of his apprehension Feuersinger stated to Officer Burroughs that "he had been in an armed robbery and he had gotten that money from it." On the following day a police officer found a .38-caliber revolver in the vicinity of the location

---

[1] The car actually was a 1949 light grey Buick 2-door sedan.

[2] Officer Wells testified that in police parlance this expression has reference to revolver, gun or hand weapon.

where Masters and Lucero had been apprehended on the previous night.

At the trial in the court below, Officer Wells, while being cross-examined by counsel for Masters, testified that Masters had told him that the first he knew that a robbery had taken place was when "both of them came running out of the store."[3] Masters, who took the stand in his own defense, testified that he drove the car to the Countryside Market where he parked it in the parking lot; that Feuersinger got out saying that he was going to go into the store to get something; that Lucero also got out "to get fresh air, or something"; that Feuersinger and Lucero came back to the car; that they were running; that Feuersinger said " 'Let's get going' "; and that he then drove away at a speed of about 50 miles per hour. It was Masters' testimony that prior to the time Feuersinger came running out of the store he did not have any knowledge of what Feuersinger was doing and that he had not discussed the robbery of any stores with Feuersinger. Masters did not deny making the statement to Officer Wells that the first time he knew that a robbery had taken place was when Feuersinger and Lucero came running out of the store. Moreover, on direct examination by his own counsel as to when he first suspected Feuersinger "had done something wrong," Masters replied: "When he came out of the store the way he did."

The following evidence was also adduced at the trial: On the afternoon of the robbery in question, Feuersinger and Lucero went together to a used car lot where Feuersinger purchased a 1949 2-door light grey Buick sedan; Masters and Feuersinger then visited one Walter Weeks from whom Feuersinger purchased a .38-caliber revolver for $20; Weeks also sold Feuersinger two holsters (a shoulder holster and a side

[3]The said examination, in pertinent part, was as follows: Q. . . . . Did you have occasion to talk to Mr. Masters at the Police Station? A. Yes, sir, I spoke to Mr. Masters. Q. Did he tell you he participated in the robbery? A. Not in that many words, but he did indicate he had a part in it. Q. He didn't tell you he participated in the robbery. Did he tell you he was in the car? A. Yes, sir. Q. Did he give you any reason why he was in the car? A. The only reason he gave me he was in the car is that he was driving Mr. Feuersinger and this other Mexican lad around. Q: What was the reason he said he was driving them around? A. He didn't give me a reason. Q. He didn't give you a reason at all? A. No, sir. Q. Did you ask him if he knew that a robbery had taken place? A. I did. Q. What did he say to that? A. He told me the first time he knew the robbery was going on, both of them came running out of the store. Q. He told you that the first time he knew that a robbery was taking place is when they ran from the store? A. That's what he told me."

holster), and some shells; the shells were at Weeks' mother's house where Masters picked them up later that afternoon; the balance of the afternoon was spent riding around in the Buick; about 8 p.m. Feuersinger was seen in a Purity Store by its night manager, Floyd Balzer, who observed Feuersinger pick up groceries, set them down, look generally around the store and at the safe on the premises; Feuersinger was then seen by Balzer to leave the store and get into an automobile, which Balzer identified as a 1950 model 2-door car and in which he saw two other persons seated; about one-half hour later Anthony Aiello, one of the owners of the Berryessa Super Market, observed an automobile, which he identified as between a 1949 and 1951 dirty white Buick parked in front of his store with the motor running and three men sitting in it; one of these men in the car was identified by Aiello as Feuersinger; Aiello then observed Feuersinger and another man looking into the front window of his store for about 10 minutes; Aiello became suspicious and closed his store; when the Buick drove off, Aiello followed it to the Countryside Store where it stopped and parked; Aiello then returned to his store to check it; Aiello later passed the Countryside Store and was told it had been robbed, whereupon he told the police what he had observed and gave them a description of the Buick.

The .38-caliber revolver which was found in the general area in which Masters and Lucero had been apprehended was identified at the trial as the same gun which Feuersinger had purchased from Weeks.

### The "Standard Instructions" on Circumstantial Evidence

Appellant contends that the trial court was required on its own motion to give certain standard instructions on circumstantial evidence, namely, such as those which embody the principles contained in CALJIC instructions Nos. 24, 25, 26, 27 and 28.[4] As stated in *People* v. *Gould*, 54 Cal.2d

---

[4] CALJIC instructions Nos. 24 and 25 define direct and circumstantial evidence. At the time of the trial CALJIC instructions Nos. 26, 27 and 28 read as follows:

No. 26: "Evidence Susceptible of Different Constructions—If the evidence in this case [as to any particular count] is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt. You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be

621 [7 Cal.Rptr. 273, 354 P.2d 865], these instructions "clarify the application of the general doctrine requiring proof beyond a reasonable doubt to a case in which the defendant's guilt must be inferred from a pattern of incriminating circumstances. [Citations.] They deal with proof of 'each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt,' the use of evidence 'susceptible of two constructions or interpretations,' and the relationship required between 'the proved circumstances' and possible hypotheses. Such instructions should not be given when the problem of inferring guilt from a pattern of incriminating circumstances is not present." (P. 629.) ██ Accordingly, it is the rule in California that, where circumstantial evidence is wholly or substantially relied on for proof of guilt, the court on its own motion must give an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion. (*People v. Yrigoyen*, 45 Cal.2d 46, 49 [286 P.2d 1]; *People v. Bender*, 27 Cal.2d 164, 174 [162 P.2d 8], et seq.; *People v. Moore*, 196 Cal.App.2d 91, 97-98 [16 Cal.Rptr. 294].)[5] ██ In *Moore* the applicable principle of law expressed by this rule is interpreted to mean that "if proof of a significant element of the charge depends upon circumstantial evidence the instruction in question should be given. [Citations.]" (Pp.

---

reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable deduction points to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt."

No. 27: "Test of Sufficiency—I instruct you further that you are not permitted, on circumstantial evidence alone, or when the case of the People rests substantially on circumstantial evidence to find the defendant guilty of the [any] crime charged against him unless the proved circumstances not only are consistent with the hypothesis that the defendant is guilty of the crime, but are irreconcilable with any other rational conclusion."

No. 28: "Each Essential Fact Must Be Proved—When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

[5]The authors of CALJIC recommend that when the People's case rests wholly or substantially on circumstantial evidence CALJIC instructions Nos. 26, 27 and 28 should all be given.

97-98.) ■ The instructions in question need not be given, however, even upon request, where the circumstantial evidence is incidental to or corroborative of direct evidence (*People* v. *Jerman,* 29 Cal.2d 189, 197 [173 P.2d 805] ; *People* v. *Yrigoyen, supra,* p. 50; *People* v. *Moore, supra,* p. 98) ; and in *Gould* it was held that the standard instructions on circumstantial evidence are not applicable to evidence of extrajudicial admissions. ■ Furthermore, in order to justify a reversal, not only must a trial court have erred in failing to give the subject instructions, but this error must have prejudiced the defendant's case. (*People* v. *Moore, supra,* p. 98; *People* v. *Koenig,* 29 Cal.2d 87, 93 [173 P.2d 1] ; *People* v. *Bender, supra,* p. 174 et seq.)

Before proceeding to the analysis of the evidence in the instant case in the light of the foregoing rules, we should first allude to the law and principles applicable to persons who are regarded as principals in the commission of a crime, and to certain principles particularly bearing upon the crime of robbery.

Section 31 of the Penal Code, in pertinent part, defines principals to a crime as: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission. . . ." ■ "Aid," within the meaning of this section, means to assist, to help, or to supplement the efforts of another and does not imply guilty knowledge of felonious intent. (*People* v. *Ellhamer,* 199 Cal. App.2d 777, 781 [18 Cal.Rptr. 905] ; *People* v *Etie,* 119 Cal. App.2d 23, 28 [258 P.2d 1069] ; *People* v. *Dole,* 122 Cal. 486, 492 [55 P. 581, 68 Am.St.Rep. 50].) ■ To "abet" a person in the perpetration of a crime one must aid or assist the direct perpetrator with knowledge of his wrongful purpose. (*People* v. *Williams,* 179 Cal.App.2d 487, 490 [3 Cal.Rptr. 782] ; *People* v. *Goldstein,* 146 Cal.App.2d 268, 272-273 [303 P.2d 892].) ■ In order to hold an accused as an aider and abettor, the test is whether the accused, in any way, directly or indirectly, aided the perpetrator, with knowledge of the latter's wrongful purpose, by words or gestures. (*People* v. *Villa,* 156 Cal.App.2d 128, 134 [318 P.2d 828] ; *People* v. *Fleming,* 191 Cal.App.2d 163, 168 [12 Cal. Rptr. 530] ; *People* v. *Carlson,* 177 Cal.App.2d 201, 205 [2 Cal.Rptr. 117].) ■ Accordingly, one may aid and abet without having previously entered into a conspiracy to commit a crime. (*People* v. *Carlson, supra,* p. 205; *People* v.

*Fleming, supra,* p. 168.) ▄▄ It has been held, therefore, that one who is present for the purpose of diverting suspicion, or to serve as a lookout, or to give warning of anyone seeking to interfere, or to take charge of an automobile and to keep the engine running, or to drive the "getaway" car and to give direct aid to others in making their escape from the scene of the crime, is a principal in the crime committed. (*People* v. *Silva,* 143 Cal.App.2d 162, 169 [300 P.2d 25]; *People* v. *Ellhamer, supra,* p. 781; *People* v. *King,* 199 Cal. App.2d 333, 338 [18 Cal.Rptr. 624]; *People* v. *Guidi,* 164 Cal.App.2d 680 [330 P.2d 885].) Accordingly, any one of these purposes is sufficient to base an inference that such person was aiding and abetting in the commission of a particular robbery. (*People* v. *Silva, supra,* p. 169; *People* v. *Ellhamer, supra,* p. 781; *People* v. *King, supra,* p. 338; *People* v. *Guidi, supra.*) ▄▄ As stated in *Silva:* "One who stays in an automobile and enables those who are robbing to make a successful 'getaway' is as much a principal and aids and abets the crime as completely as though he were present and assisted in the actual taking of the property." (P. 169.) ▄▄ A robbery is not confined to the very act of taking the property out of the hands of the victim. The nature of the crime is such that the escape of the robbers with their loot is as important to the execution of the crime as gaining possession of the property itself. (*People* v. *Ketchel,* 59 Cal.2d 503, 523 [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Rye,* 33 Cal.2d 688, 693 [203 P.2d 748]; *People* v. *Boss,* 210 Cal. 245, 250-251 [290 P. 881]; *People* v. *Dowell,* 204 Cal. 109, 118 [266 P. 807].) In the purview of the law the crime of robbery is not complete until the robber has won his way to a place of temporary safety. (*People* v. *Ketchel, supra* p. 524; *People* v. *Boss, supra,* pp. 250-251.)

▄▄ In the case at bench the commission of the robbery by Feuersinger was established by the direct evidence of the victim. Moreover, Feuersinger, who sought to take full responsibility for its commission, admitted the robbery both to the police after his arrest and upon taking the stand as a witness. Breakwell's testimony of Feuersinger's immediate flight from the Countryside Market after the robbery; his observation of Lucero standing in front of the market, and then running away as Breakwell came out of the market; the getting into the Buick by Feuersinger and Lucero as the car moved slowly with the door on the right side open; the speeding away at a high rate of speed after Lucero and Feuersinger

got in; and the observation of a third man in the car who was its driver, is direct evidence. The running away from the store by Lucero and Feuersinger, testified to by Masters himself, is additional direct evidence. Masters' testimony that he drove the car to the Countryside Market and that he drove it away after Lucero and Feuersinger ran from the store is direct evidence which places him at the scene as the driver of the getaway car. Masters' own testimony that as he drove away from the market his speed was 50 miles per hour is direct evidence of this fact, as is his testimony of the route he drove immediately after leaving the Countryside Market. The testimony of the officers of the pursuit of the Buick on the Bayshore Highway and the incidents related thereto is likewise direct evidence.

In addition to the foregoing direct evidence, we have the extrajudicial admission of Masters that the first time he knew a robbery had been committed was when Lucero and Feuersinger ran from the store. This admission and the facts establishing that he was the driver of the getaway car, that he drove away at a rapid rate of speed, and the manner in which he drove the car during the pursuit by the officers shortly after the robbery, were sufficient to support an inference that Masters had knowledge of Feuersinger's wrongful purpose and that he was an aider and abettor so as to make him a principal in the commission of the robbery. ■■■ ''The question of whether or not a person who was present at the time and place of the commission of a crime has aided and abetted therein is one of fact for the trier of fact to decide from all of the circumstances proved.'' (*People* v. *Silva, supra,* p. 169.)

■■■ The above-mentioned direct evidence and extrajudicial admission aforesaid are sufficient to establish appellant's guilt. Such direct evidence and admission did not require the court to give the standard instructions on circumstantial evidence. The circumstantial evidence in the record consisting of the incidents and events preceding the robbery, as well as the finding of the revolver the day after the robbery in the proximity of the area where Masters was arrested, were, at most, merely corroborative. These circumstances were not necessary to the establishment of appellant's guilt, nor can it be said, in the light of the record, that the People relied wholly or substantially on such evidence. In short, the jury was not confronted with the problem of inferring guilt from a pattern of incriminating circumstances, but it had be-

fore it sufficient and substantial direct evidence, coupled with an extrajudicial admission, which, under the rule announced in *Gould* made it unnecessary to give the instructions governing reliance upon circumstantial evidence as to proof of guilt.

The judgment and the order denying a motion for a new trial are affirmed.

Bray, P. J., and Sullivan, J., concurred.