[Crim. No. 2608. Fourth Dist., Div. One. Apr. 14, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CLAUDE DELOIS SANDERS III et al., Defendants and Appellants.

Fred E. Corbin, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Marvin A. Bauer, Deputy Attorney General, for Plaintiff and Respondent.

WHELAN, J.—In a jury trial defendants were found guilty of possession of marijuana for sale (Health & Saf. Code, § 11530.5) and of transporting marijuana (Health & Saf. Code, § 11531). They were sentenced on both counts for the terms prescribed by law. Execution of sentence as to the possession for sale charge was ordered stayed pending any appeal and during the service of any sentence the Adult Authority should pronounce in connection with count two, transporting marijuana; at the completion of the service of any sentence in connection with count two the stay was to become permanent. Each of the defendants was charged with and admitted prior convictions of two felonies. Defendants appeal.

FACTS

On October 30, 1965 at about 1:55 p.m., Cody Isbell, a deputy sheriff of San Diego County, on duty in a patrol car, heard over his radio a broadcast which he identified as coming from the main business office of the Sheriff's Department of San Diego County that a motor vehicle either of the style known as an El Camino or of that known as a Ranchero, cream or light brown in color, with California license D 73011, containing a male Mexican adult and a non-Mexican white male adult, contained marijuana hidden in the bed of the truck and had left Calexico for an unknown destination.

Isbell drove his car to Highway 80 which he entered and on which he drove easterly in the direction of El Centro and Calexico, El Centro being about 45 minutes driving time from the vicinity where he came onto Highway 80. Shortly, he ob-

served a dark brown El Camino 1960 model pickup pass him as it travelled in the direction away from El Centro and Calexico. Isbell turned and followed the other vehicle; he observed that there were two occupants who met the descriptions he had heard over the radio and that the license number of the vehicle was the same.

Isbell radioed the sheriff's business office to say that the wanted vehicle was in front of him, and that he intended to pull it over at some point ahead. He brought the El Camino to a stop with his own car stopped immediately behind and alighted, carrying a shotgun. Sanders, the driver of the El Camino, got out, asked what it was all about, and was told that Isbell would inform Sanders as soon as additional help should arrive. Isbell directed that Rodriguez also alight from the El Camino and that he and Sanders place their hands on the roof of the car until other officers should arrive, which was done.

In about three minutes, two Highway Patrol officers came on the scene. Sanders and Rodriguez were then handcuffed and their persons searched as well as the driver's compartment of the El Camino.

With the use of a socket wrench found in the El Camino and two other wrenches, the three officers removed the bolts that held the floor of the truck bed to the chassis, of which there were 20 to 30. All of them appeared to have been removed previously, the paint from around the bolts having been peeled off. In a recess under the floor of the truck, well forward, four brown packages were found. The coverings of the packages permitted Isbell to see and to smell a part of the contents, which, in his opinion, was marijuana.

Deputy Sheriff Narron of the narcotics detail came to the scene. He examined the packages and was of the opinion they contained marijuana. He gave the defendants advice of their constitutional rights required to be given by *People* v. *Dorado*, 62 Cal.2d 338 [46 Cal.Rptr. 169, 398 P.2d 361].

In response to questions by Narron at that time, Sanders said he had been coming from Calexico, that he had not known Rodriguez before, that he had never before seen the four packages that came from his vehicle, that he had never known anything about narcotics, that he lived in Santa Maria, and that he didn't wish to talk any longer to Narron and wanted to see an attorney.

In response to questions by Narron at that time, Rodriguez said he had been coming from the valley; that he had not

known Sanders before; that he had been hitchhiking and Sanders had stopped and given him a ride; that he had been arrested previously on a narcotics charge; and that he did not wish to talk further without an attorney.

After qualifying as an expert in knowledge of the traffic in marijuana, Narron gave testimony from which it might be inferred that four kilos, the quantity of marijuana contained in the four packages, was a commercial quantity.

Upon analysis, the contents of the four packages proved to be marijuana, as did certain debris from Sanders' jacket found in the car, from the pockets of the clothing he wore, and from pockets of the clothing worn by Rodriguez.

The radio message heard by Deputy Sheriff Isbell had not named the source of the information that it contained.

Paul V. Martin, an official of the Customs Agency Service of the United States Customs Bureau, testified, outside the presence of the jury, that on October 30 he was given certain information by an informant concerning a smuggling operation from a foreign country.

A few days prior to October 30, Martin had information from the informer that two persons would be coming down from the north to purchase marijuana in Mexico about October 30; Martin told the informer how he could be reached by telephone on that date; on October 30, shortly after 1 p.m., the informer in person told Martin that there was a quantity of marijuana being smuggled in an El Camino or Ranchero vehicle, that the vehicle was light cream or brown in color, with California commercial license plate D 73011.

The information included a description indicating that one of the suspects was a male American adult, and the other a male Mexican adult; did not include a statement as to the quantity of the purchase; and did include a statement that the marijuana was supposed to be under the floor of the back of the pickup. The informer did not say whether his information was based upon his own observation or had been obtained from another; Martin did not know if the informer had been present at or participated in the sale.

Upon receiving the information, Martin immediately searched the Calexico-El Centro area for the described vehicle, without success. He then called the Imperial County Sheriff's Department, gave the information he had received, requested that the sheriff place an all-points radio broadcast for the described vehicle, and requested that the sheriff stop and hold the vehicle.

Martin had been in touch with the informer for about a year prior to October 30, during which time the informer had supplied Martin on approximately 15 occasions with specific information about the smuggling of narcotics into the United States; the previous information from the informer had resulted in an estimated 15 arrests and convictions and on no occasion had been found to be inaccurate; Martin had acted on the basis of such information on those prior occasions; arrests and searches made as the result of such information resulted in prosecutions in the United States courts, in all of which there had been convictions after trial or as the result of plea, except in the two cases then on trial.

The following questions and his answers were put to Martin:

"Q. Will you reveal the identity of the informant at this time? A. No, sir.

"Q. And why won't you reveal the identity of the informant? A. I have been instructed by the Customs Agency Service as a matter of policy that that department will not reveal confidential informants in the courtroom.

"Q. And have you been told by the Customs Agency Service what you are to do if you are ordered by a Court to reveal the identity of this informant? A. I am to respectfully indicate the reasons therefor, and decline to answer the name of the informant.

"Q. And what happens if the Court tells you they are going to hold you in contempt of court? A. I will be held in contempt, I guess."

Sanders testified he left Santa Maria about 6 p.m. of October 30 and drove to Mexicali where he had not previously been and where he arrived about 11 or 11:30 p.m. He registered at a hotel after locking his car, which was left alongside the hotel on a street just off the main street; he then left the hotel to look around. Outside the hotel a man accosted him asking if Sanders would carry a package across the border for him; Sanders said "No"; the man was persistent and suggested there would be compensation; Sanders had a hard time getting rid of the man, who was seen again in the company of two other men when Sanders returned to the hotel some three hours later. Next morning Sanders drove to Calexico about 12:25 p.m. and, seeing Rodriguez, whom he had not known before, asked the road to San Diego. In consideration for giving the directions, Rodriguez asked for and was given a lift. Sanders said he did not know how the packages got into his

vehicle; that he had not had any connection with or used marijuana since 1959 when he had been convicted of a narcotics offense for which he served 18 months. He had not removed or loosened the bed of the truck on October 29 or 30 nor seen it removed or loosened; nor had he removed it since about two months before.

Rodriguez testified he had gone by bus to Calexico from Lompoc on October 28 to visit his father who lived in Mexicali; Rodriguez put up in a hotel in Calexico and sent a message to his family in Mexicali; they came to see him on October 29 and left him about 5 p.m.; they came again on Saturday at about 10 a.m. and were with him until about noon; when he went to the bus depot he had missed his bus and was given a ride by Sanders whom he had not known before and whom he encountered at about 12:35 p.m.; he had not known of the presence of the packages under the bed of the truck and did not know what was in them; he had been convicted in 1959 of smuggling marijuana and was released in August 1965, since when he had not had anything to do with narcotics; he had not been in Mexico during his trip to Calexico.

The testimony of both Sanders and Rodriguez suggested the possibility that marijuana fragments might have gotten into their pockets while their personal effects, removed earlier by the sheriff's officers, were being put back by the officers.

Rodriguez's sister testified that she lived in Mexicali with her father; that they learned on October 28 that Rodriguez was in Calexico; and she corroborated his testimony as to the family visits on October 29 and 30.

### CONTENTIONS OF DEFENDANTS

Defendants state their contentions thus:

1. The evidence obtained by the law enforcement officers was the product of an illegal search and seizure.

2. The trial court erred in overruling defendant's objection to the introduction of such evidence and the testimony of the police officers derived from an illegal arrest, search and seizure.

3. The failure of the state to produce or to disclose the name of a material witness, or to disclose the name of the confidential informant, deprived the arrest and search of any basis of legality. The court also erred in denying defendants' motion for a new trial based on that contention.

4. The trial court erred in submitting for the jury's con-

sideration two separate counts against each defendant for the possession of marijuana for sale and for transportation of marijuana; that for those offenses there can be only one conviction.

WAS THERE PROBABLE CAUSE FOR THE ARREST OF DEFENDANTS?

■ Yes; having received through the official broadcast from the San Diego County sheriff's office information sufficient to arouse reasonably in the mind of a careful and prudent man a strong suspicion, honestly held, that the occupants of the El Camino were engaged in the transportation of marijuana, a felony, Officer Isbell had probable cause to arrest those occupants and as an incident to the arrest to search the car at the place of arrest, whether before or after the arrest. (See *People* v. *Webb*, 66 Cal.2d 107, 111-112 [56 Cal.Rptr. 902, 424 P.2d 342]; *People* v. *Melchor*, 237 Cal.App.2d 685, 690 [47 Cal.Rptr. 235]; *People* v. *Schellin*, 227 Cal.App.2d 245, 251 [38 Cal.Rptr. 593]; *People* v. *Jackson*, 202 Cal.App.2d 569, 574 [21 Cal.Rptr. 44]; *People* v. *Hood*, 150 Cal.App.2d 197, 201 [309 P.2d 856].)

This preliminary justification for the arrest, search and seizure rests ultimately upon the source of the information broadcast by the sheriff's office; although, in this second link in the chain leading from the arrest back to the informer, of which the first link is the information received by the arresting officer, it was again proper for the San Diego sheriff to rely upon the information received from the Sheriff of Imperial County, who in turn might rely upon information certified to be credible by Martin, an official of the United States Treasury Department, concerning a matter coming within the scope of his official duties. (*People* v. *Lopez*, 196 Cal.App.2d 651, 654 [16 Cal.Rptr. 728].) Having reached this fourth link in the chain downward, we face the duty of testing the admissibility of the evidence obtained as the result of the arrest and search made upon what the arresting officer considered to be probable cause. That test is whether Martin had sufficient reason to rely upon the information given to him by the paid informer.

Martin's previous transactions with the informer, as testified to by Martin and as recited herein, made it reasonable for him to rely upon the information given him on October 30. That information, in view of the reliability of the informer, would have given Martin probable cause for an arrest and incidental search; and, ascending through the chain of official

communication to Isbell, offered probable cause for the arrest and search actually made.

It was not Isbell's duty to inquire behind the official message received by him for the purpose of determining its ultimate source, just as it is not the duty of an officer serving a warrant of arrest regular on its face to inquire into the sufficiency and reliability of the evidence upon which the warrant was ordered to issue. That does not mean that the pivot upon which the structure of apparent legality rests is immune from attack. In the instant case that attack fails to shake the sufficiency and reliability of the evidence to establish probable cause.

That the information from the reliable informer was passed on through several successive agents, each of whom was entitled to place reliance in the one from whom he received the information, does not destroy its value as a basis for probable cause. (*People* v. *Gorg,* 157 Cal.App.2d 515, 520 [321 P.2d 143].)

WAS THE EVIDENCE PRODUCED BY THE SEARCH RENDERED
INADMISSIBLE BY THE PROSECUTION'S FAILURE TO
DISCLOSE THE NAME OF THE INFORMER?

No; in the light of all the circumstances testified to by Martin, who was subjected to cross-examination, it was within the sound discretion of the trial judge to permit the evidence to be introduced without requiring as a condition that the identity of the informer be disclosed. (Former Code Civ. Proc., § 1881.1.)[1] Our Supreme Court has given recognition to the application of former section 1881.1, Code of Civil Procedure, in a proper case. (*Martin* v. *Superior Court,* 66 Cal. 2d 257 [57 Cal.Rptr. 351, 424 P.2d 935].) A rule such as that expressed in former section 1881.1 does not, under the authority of *McCray* v. *Illinois* (March 20, 1967) 386 U.S. 300 [18 L.Ed.2d 62, 87 S.Ct. 1056], offend against the inhibi-

---

[1]Former section 1881.1, Code of Civil Procedure, superseded by section 1042, subdivision (c), Evidence Code, until January 1, 1967, read as follows: "In any preliminary hearing, criminal trial, or other criminal proceeding, for violation of any provision of Division 10 (commencing with Section 11000) of the Health and Safety Code, evidence of information communicated to a peace officer by a confidential informant, who is not a material witness to the guilt or innocence of the accused of the offense charged, shall be admissible on the issue of reasonable cause to make an arrest or search without requiring that the name or identity of the informant be disclosed if the judge or magistrate is satisfied, based upon evidence produced in open court, out of the presence of the jury, that such information was received from a reliable informant and in his discretion does not require such disclosure."

tion of the Fourth Amendment to the federal Constitution. *McCray*, indeed, quotes language from section 1042, subdivision (c), Evidence Code, formerly found in section 1881.1, saying: ''What Illinois and her sister States have done is no more than recognize a well-established testimonial privilege, long familiar to the law of evidence.''

While in *McCray, supra,* the cross-examination developed the names of persons convicted as the result of information supplied by the informer, that test of the verity of Martin's testimony was not made in the instant case. However, that failure was not the result of the refusal of the witness to give such information nor the result of any objection made by the prosecution or sustained by the court. The sustaining of objections to such questions would be error. (*People* v. *Robinson,* 166 Cal.App.2d 416, 421 [333 P.2d 120].)

On the question of the constitutionality of former section 1881.1 with relation to the admissibility of the evidence found and seized as an incident to the arrest, no distinction need be made between a proceeding to suppress evidence, as in *McCray, supra,* a preliminary hearing, as in *Martin, supra,* and the criminal trial, as in the case at bench.

██ We believe that the proper application of former section 1881.1 does not exclude from the definition of ''peace officer'' an officer of the Customs Bureau charged with enforcing the laws of the United States governing illegal importations from foreign countries in a matter concerning the official duties of enforcement. A footnote in *People* v. *Yet Ning Yee,* 145 Cal.App.2d 513, 516 [302 P.2d 616], states: ''. . . Prziborowski was a federal agent and not a 'peace officer' justified to make an arrest under section 836, Penal Code, as he is not included in the definition of 'peace officer' in section 817.''

Section 817, Penal Code, provides in part: ''When in any law a public officer or employee is designated as, given the powers of, or determined to be, a peace officer, such officer or employee shall be deemed to be a peace officer but only for the purpose of that law.''

In the enforcement of the customs laws of the United States, officers of the customs are authorized to search vehicles and persons, to make arrests and seizures, and to demand of any person within three miles to assist the officer in making any arrest, search or seizure that the officer is authorized to make, all subject to the statutes conferring such authority. (§§ 482, 507, 1581(a), 1581(f), 19 U.S.C.A.)

Without so much as suggesting that such federal officer has the powers of a peace officer under California law, it does no violence to the language of former section 1881.1, Code of Civil Procedure, to hold that such officer, as to information received by him in his official capacity and bearing upon his official duties, may be accorded the testimonial privilege permitted by former section 1881.1.

DID THE REFUSAL TO DISCLOSE THE NAME OF THE INFORMER DEPRIVE DEFENDANTS OF A MATERIAL WITNESS?

■ No. The California rule as stated in *People* v. *McShann*, 50 Cal.2d 802, 808 [330 P.2d 33], is this: "A mere informer has a limited role. 'When such a person is truly an informant he simply points the finger of suspicion toward a person who has violated the law. He puts the wheels in motion which cause the defendant to be suspected and perhaps arrested, but he plays no part in the criminal act with which the defendant is later charged.' (*People* v. *Lawrence, supra,* 149 Cal.App.2d at 450 [308 P.2d 821]) His identity is ordinarily not necessary to the defendant's case, and the privilege against disclosure properly applies. When it appears from the evidence, however, that the informer is also a material witness on the issue of guilt, his identity is relevant and may be helpful to the defendant. Nondisclosure would deprive him of a fair trial. Thus, when it appears from the evidence that the informer is a material witness on the issue of guilt and the accused seeks disclosure on cross-examination, the People must either disclose his identity or incur a dismissal. (See *Roviaro* v. *United States, supra,* 353 U.S. at 61 [1 L.Ed.2d at 645, 77 S.Ct. 623].) "

In the instant case it does not appear from the evidence that the informer was present when the packages of marijuana were put into the vehicle or at the earlier sale or delivery of the marijuana, or that he had claimed to Martin that he was such a witness or had any communication or relationship with defendants or either of them.

*People* v. *McShann, supra,* 50 Cal.2d 802, and *Roviaro* v. *United States,* 353 U.S. 53 [1 L.Ed.2d 639, 77 S.Ct. 623], relied upon by defendants, are, therefore, clearly and easily distinguishable factually from the case at bench. In *McShann* it was the prosecution's theory that the unnamed informer had purchased heroin from defendant, which was then delivered to the police; and that telephone conversations overheard and electronically recorded by police were had by the informer with the defendant, the recordings of which conver-

sations were played to the jury. The defendant on his part denied having made any sale and having taken part in the conversations. In *People* v. *Williams*, 51 Cal.2d 355 [333 P.2d 19], also, the unnamed informer had been a participant in the purchase of narcotics from the defendant.

Of *Roviaro*, the U. S. Supreme Court said, in *McCray*: ". . . the informer had been an active participant in the crime. He 'had taken a material part in bringing about the possession of certain drugs by the accused, had been present with the accused at the occurrence of the alleged crime, and might be a material witness as to whether the accused knowingly transported the drugs as charged.' "

In *Roviaro* itself the court said: "This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. Moreover, a government witness testified that Doe denied knowing petitioner or ever having seen him before. We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure." (*Roviaro* v. *United States, supra,* 353 U.S. 53, 64-65 [1 L.Ed.2d 639, 647, 77 S.Ct. 623, 630].)

WERE THE CRIMES OF TRANSPORTATION AND OF POSSESSION FOR SALE SEPARATE AND DISTINCT OFFENSES SO AS TO MAKE BOTH CONVICTIONS PROPER?

 Yes; the crime of possession for sale may be committed without committing the crime of transporting; and while the crime of transporting cannot be committed without possession of the thing transported, such possession need not be for the purpose of sale. If the possession is only that which is incident to the transportation or sale, the possession and transportation or sale constitute a single offense; and if the transportation is only that which is incident to the sale, the result is the same. (*People* v. *Roberts*, 40 Cal.2d 483, 491 [254 P.2d 501].) The two convictions were proper. (*People* v. *Mc-Farland*, 58 Cal.2d 748, 762 [26 Cal.Rptr. 473, 376 P.2d 449].)

 However, both statutes were violated concurrently and with a single objective. There is no evidence that the possession preceded the commencement of the transportation; and the prosecution's theory was that there was concurrent possession and transportation when the contraband entered

California. To inflict double punishment on defendants for an indivisible course of conduct which has a single objective and which at once is violative of more than one penal statute would offend against the proscription of section 654, Penal Code.

The imposition of sentence for two or more counts under such circumstance is reversible error if the result would be to affect the defendant's rights adversely, and would be so even though the sentences are made to run concurrently. (*People* v. *Branch,* 119 Cal.App.2d 490, 496 [260 P.2d 27].)

■ Here, the trial court did not seek to impose double punishment. In pronouncing judgment, he told the defendants: "It is the intention of the Court that you should serve a sentence for the greater of the two counts, that is the one that carries the greater penalty, namely, the transportation. And my intention is to so sentence you and to comply with the law of *People* v. *Caruth,* 237 Cal.App.2d 401 [47 Cal.Rptr. 29], *People* v. *Nelson,* 233 Cal.App.2d 440 [43 Cal.Rptr. 626], and *People* v. *Alvarado,* 231 Cal.App.2d 789 [42 Cal.Rptr. 310]."

The language used in imposing sentence and staying execution on the count charging possession for sale is the same as that used in *People* v. *Niles,* 227 Cal.App.2d 749, 755 [39 Cal.Rptr. 11]. It was held in that case not to constitute double punishment. The same procedure was approved in *People* v. *Johnson,* 242 Cal.App.2d 870, 876-877 [52 Cal.Rptr. 38]. When the sentence for transportation shall have been completed, defendants will have served a term of imprisonment for only one felony.

Judgments affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied April 20, 1967.