[Crim. No. 4670. Second Dist., Div. Three. Sept. 26, 1951.]

THE PEOPLE, Respondent, v. MIKE HERNON, Appellant.

Redmond & Redmond and William Bronsten for Appellant.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—In an information defendant was charged with kidnaping, in that, on July 18, 1950, he did unlawfully and forcibly take, arrest, and carry Robert Hurley to another part of Los Angeles County. Trial by jury was waived. Defendant was adjudged guilty of violation of section 236 of the Penal Code (false imprisonment), a lesser

offense than that charged in the information but necessarily included therein. The judgment was that defendant pay a fine in the sum of $500. Defendant appeals from the judgment, sentence, and order denying his motion for a new trial.

Appellant contends that the evidence is insufficient as a matter of law to justify his conviction of the crime of false imprisonment. He also contends that the trial court erred prejudicially in granting plaintiff a continuance after the plaintiff and defendant had rested.

Defendant's wife, who was lessee of premises (a beer parlor) known as the "Hangout," and who was also owner of the fixtures therein, sold the fixtures to a Mr. Carrell who gave her a chattel mortgage on them to secure payment of the sum of $3,500. He thereafter failed to make any payments on said indebtedness, and defendant's wife obtained a judgment, in a foreclosure action, for $4,200—being $3,500 for principal, $200 for interest, and $500 for attorney's fees. The date set for the sale of the fixtures, pursuant to the judgment of foreclosure, was July 18, 1950, at 11 a.m. Prior to that date defendant's wife sold "the business" to Mr. Kesgard, "with the understanding" that she would give him a clear title to the fixtures, and thereafter he operated the business. On July 17, 1950, the day before the sale, Mr. Hurley, a building construction salesman, had a conversation with defendant's wife at the Hangout. According to the testimony of Mr. Hurley, defendant's wife asked him to come to her apartment and talk with defendant; about 3 p. m. that day the witness and Mr. Kesgard went to her apartment and she introduced the witness to the defendant; defendant asked the witness why he was bidding on the fixtures, and the witness replied that he was making a deal with Mr. Kesgard to buy the place for a price, which he understood to be $7,000, but that he was mistaken because Mr. Kesgard wanted $8,000; the witness further stated to defendant that his (witness') lawyer had advised him to bid on the fixtures and had told him if he could pick the fixtures up "for $1500 in that manner," (at the sale) he could save $2,000 on the purchase price; the witness told defendant if he (witness) could make $1,000 on the fixtures he would be able to buy the place for $7,000, the original price he had planned to pay; defendant's wife said it was blackmail for the witness to say he was going to try to make $1,000, and the witness replied that it was merely a business proposition on his part; defendant told the

witness it wouldn't do him any good to get the fixtures as the witness would have to take them out of the place, and the witness replied that he didn't think he would have to move them but if he did have to move them he had a place where he could put them—that his lawyer thought he had a foothold by owning the fixtures; defendant and his wife stated they were prepared to bid $4,200 on the fixtures, and the witness told them that he was going to the sale with $3,500 and he would go that high, but if they bid $3,501 they could have the fixtures; the witness then returned to the Hangout, and he "completed a deal" with Kesgard; he next saw defendant about 10:20 a. m. on the following day (the day of the sale) at the Hangout where the sale was scheduled to take place at 11 a. m.; when the defendant entered the Hangout, defendant's wife had just finished talking to the witness, and the witness said that he wasn't there to argue; defendant stated, "You aren't going to give anyone any argument," and that he would put the fixtures right out in the street if the witness bid them in; the defendant then walked away, and about 10:40 a. m. he came over to the place where the witness was sitting and asked him if he could talk to him "personally"; the witness said, "Yes"; then the defendant walked toward the front door, through some curtains that were hanging outside the door, and "walked out in front" of the Hangout, and the witness followed him; the defendant turned to the right and said something over his right shoulder; he then stepped back against the building and while the witness was walking toward the defendant he (defendant) looked over the shoulder of the witness and nodded; at that time two men, whom the witness had not seen, grabbed him on each side, and a hard dark object struck him in the side; the two men propelled him ahead and said, "Keep walking"; the witness asked, "What is the idea?" and one of the men said, "Just keep walking"; each of the men weighed about 175 pounds; the witness weighed 143 pounds; they held him by his arms and he "was walked up the street to the Club Lorraine Bar," which was about 8 blocks from the Hangout; during that walk they did not pass anyone, and the witness did not notice whether anyone was on the other side of the street; they entered the Club Lorraine, and the witness sat between the two men at the bar; the two men and the witness each ordered a drink, which the witness paid for; each of them ordered a second drink, which the two men paid for;

they stayed there until 5 or 7 minutes after 11 o'clock; the witness said, "I guess you're through with me"; then one of the men went to a telephone booth and after he returned he said, "I guess that's all"; then the three of them walked out of the bar—the witness walking ahead of the two men; the witness went a block west, then he turned around and saw the two men going the other way; the witness had in his possession $3,000 in cashier's checks payable to himself, $558 in cash and a diamond ring.

A deputy sheriff of Los Angeles County, called as a witness by the People, testified that he went to the Hangout about 10:30 a. m. on July 18, 1950, for the purpose of holding "the sale of the chattels of the place"; when he arrived there, he thought he saw defendant talking to Hurley; the witness talked to the defendant once or twice; the defendant was "in and out and all around there"; the defendant then went in the direction of Hurley and then the two of them left the Hangout; the witness did not see the defendant or Hurley return to the Hangout; the sale was conducted at 11 a. m. and defendant's wife purchased the fixtures for $500; the sale was concluded about 2 minutes after 11 o'clock, and Hurley was not there and did not bid on the fixtures.

Defendant testified that on the day before the sale Hurley and Kesgard came to his apartment where Hurley told the defendant that he was going to bid on the fixtures at the auction the following morning, but that he would not bid if defendant and his wife would give him $1,000; defendant's wife said, "We will not give you or anybody else a thousand dollars"; the defendant told Hurley that he (Hurley) would have the privilege of bidding due to the fact that it was a public auction but that he would be bidding on the fixtures and not the business, and if he bought the fixtures he would have to take them out; Hurley replied that he would take the fixtures out and put them in storage; he (Hurley) also said that the defendant and defendant's wife had sold the fixtures to Kesgard and if he (Hurley) bought the fixtures the defendant and his wife could not deliver them to Kesgard, and he wanted to know if the defendant would give him $1,000; defendant replied, "I won't give you no thousand. Go ahead and bid and get the fixtures"; defendant again saw Hurley on the day of the sale in the Hangout, and he went up to Hurley and said, "I would like to have a word with you"; defendant walked out of the Hangout and Hurley followed him; Hurley walked about 8 feet west of the

door of the Hangout and defendant said, "I understand you bought the fixtures and all from Mr. Kesgard last night"; Hurley said that he did not buy them but Mr. Rossi bought them; about that time defendant noticed an old friend (Mr. Howard) standing near the door of a restaurant (next door to the Hangout) and about 6 feet behind Hurley; the friend waved his crutch, and the defendant nodded; about the same time Hurley walked off in a westward direction and he met "these two fellows" who came up from the curb, probably from across the street; Hurley said, "How are you, fellows?" and put his arm on the left shoulder of one of the men, and walked away; Hurley was between the two men; defendant had never seen the two men before that time and has not seen them since; after Hurley walked away with the two men, the defendant stood there dumbfounded—he didn't know what was up. He testified further that he did not ask Hurley why he was bidding on the fixtures; he at no time told Hurley that he did not want him to bid on the fixtures; nothing was said about an "argument" on the day of the sale; on that day defendant had a discussion with a customer, talked to one of the auctioneers and then went over to Hurley and said, "Come on out I want to have a word with you." Defendant testified further that the $500 which his wife paid for the fixtures was deducted from the "deficiency" judgment against Carrell; and that if anybody else had attended the sale and bid $3,500 for the fixtures defendant would have received the $3,500 but would have lost the fixtures.

Defendant's wife testified that on the day before the sale, when she saw Hurley in the Hangout, he said to her, "By the way, I got to buy an engine. Do you know anybody that wants to give me a thousand dollars?" and "I am going to bid on the fixtures. If you give me a thousand dollars I won't bid"; the witness replied that she would not give anyone $1,000, that it was his privilege to bid if he wanted to; she also told him to see Kesgard; thereafter she told Kesgard that she wanted to see him, and Kesgard and Hurley came to her apartment; Kesgard stayed about a minute and then left; then Hurley stated that he would not bid if the witness would give him $1,000, and she told him she did not intend to give him any money; defendant told Hurley that he had a right to bid at the public auction and buy the fixtures and take them out; they could replace the fixtures very easily; Hurley asked them how they were going to deliver the fixtures to Kesgard if he (Hurley) bought them. She testified further

that on the day of the sale she was in the Hangout; she talked with the sheriff but she was not with Hurley; she saw defendant and Hurley talking and saw Hurley follow the defendant outside; she saw Hurley again between 11:00 and 11:30 a. m., after the sale was made.

An employee of the Hangout, called as a witness by defendant, testified that the day before the sale he saw defendant's wife and Hurley in the Hangout; Hurley had a ring which looked like a diamond, and he (Hurley) said he had a diamond which he would like to sell for $1,000; Hurley was talking about bidding on the fixtures, and he said for $1,000 he would not make a bid; and defendant's wife told him to bid if he wanted to, that it didn't make any difference to her, and she was not going to give him $1,000.

Mr. Howard, called as a witness by defendant, testified that on the morning of July 18, 1950, he was in a restaurant next door to the Hangout; he left the restaurant about 10:30 a. m., and as he opened the door he noticed the defendant and he nodded to him and defendant nodded to the witness; defendant, who was facing the witness, was talking to a man whose back was toward the witness; the witness then noticed two men approach; they were heavy-set men who weighed approximately 175 pounds each; the two men were facing Hurley; he greeted them, and they walked away with Hurley in the center; Hurley seemed to recognize one of the men because he rested his arm around the man's shoulder.

Appellant asserts that the evidence is insufficient as a matter of law to justify the conviction. He argues that the testimony relied upon by the prosecution is so improbable or "false" that it amounts to no evidence at all; that the trial judge should have eliminated the testimony of the complaining witness Hurley, and if that testimony had been eliminated there would not have been any evidence "which would connect the defendant," since the only evidence of abduction was the testimony of the complaining witness that he thought he saw the defendant nod to someone. The crime of false imprisonment, of which defendant was convicted, is defined by section 236 of the Penal Code as follows: "False imprisonment is the unlawful violation of the personal liberty of another." ▮▮ Although it is not essential that a motive on the part of defendant be established, a motive on his part is an important circumstance to be considered in determining the facts. ▮▮ The trial judge could have found reasonably that defendant was much interested in not having competi-

tive bidding at the sale by Hurley. Apparently no one, other than defendant's wife and Hurley, was interested in bidding at the sale. The judge could also have found reasonably that defendant conspired with and aided and abetted the two men who removed Hurley from the place where the sale was to be held; that defendant, with the purpose of aiding in the abduction of Hurley, caused him to go, and led him, to the place from which he was abducted; and that when he had enticed Hurley to the place from which the abduction occurred he nodded to the two men as a signal that it was the time and place to accomplish the abduction. The judge stated that he did not believe the defendant. The evidence was sufficient to support the judgment.

▮ Appellant also contends that the court erred in continuing the trial after the parties had rested. By stipulation the plaintiffs submitted the case upon the transcript of the preliminary examination, and the parties reserved the right to present further testimony. When the judge said that he had read the transcript, the deputy district attorney said that plaintiff rested the case subject to the reservation of counsel for defendant ''to recall Mr. Hurley as soon as we can locate him.'' Thereupon defendant's counsel called the defendant as a witness and proceeded with the defense. When defendant's counsel said that defendant rested the case, the judge said: ''I understand that you want to cross examine Mr. Hurley further. He can come in tomorrow morning.'' Counsel for defendant said: ''As far as the examination of Mr. Hurley is concerned we are not interested at this point.'' The judge then said: ''Well, I am. I want to hear something more from him. You get him here in the morning.'' The deputy district attorney said that he wanted Hurley in rebuttal. Thereupon, without objection by defendant, the trial was continued until the next day, December 6th. The next day the deputy district attorney said that the district attorney had been unable to locate Hurley, that the court had previously ordered Hurley to return to court as a witness, and that the employer of Hurley said that on the previous night he had seen Hurley in an intoxicated condition. He also asked that a bench warrant for the apprehension of Hurley be issued and that the trial be continued for a few days. Defendant's counsel objected to the continuance. The judge said that it was the duty of the court ''to seek out the facts, and the Court believes that this witness is a necessary and material witness and would like to hear from him.'' A bench

warrant was ordered, and the trial was continued to December 18th. On December 18th the deputy district attorney said that Hurley had not been located and that under the circumstances the plaintiff would rest. Thereupon the deputy district attorney and counsel for defendant said that the case was submitted. Appellant argues that the judge apparently had some doubt as to the guilt of defendant, otherwise he would not have wanted to hear further from Hurley. In view of the facts that the plaintiff's case had been submitted upon the transcript of the preliminary examination and the judge had not heard Hurley testify, and that the deputy district attorney had said at the beginning of the trial that the stipulation to submit the case on that transcript was subject to the reservation of counsel for defendant to recall Hurley, it appears that it was contemplated that Hurley would be in court to testify at the trial. The fact that the judge indicated that he wanted to see and hear the witness testify does not mean that he had a reasonable doubt as to the guilt of defendant. Even though the deputy district attorney and defendant's counsel had stipulated that the plaintiff's case might be submitted upon the transcript of the preliminary examination, it might be that the trial judge considered that there would be a more satisfactory presentation of the case if the complaining witness were required to appear as theretofore ordered and be cross-examined before the court. In deciding the case the judge said: "I am satisfied that this defendant was in conspiracy with these two strangers who were not apprehended. It is purely a question of fact for the Court to determine. . . . I just don't believe the defendant's story, that is all." Furthermore, it does not appear that defendant was prejudiced by the order continuing the trial. This contention regarding the continuance is not sustainable.

The purported appeal from the sentence is dismissed. (See *People* v. *Tallman,* 27 Cal.2d 209, 215 [163 P.2d 857, 860].)

The judgment and the order denying the motion for a new trial are affirmed.

Shinn, P. J., and Vallée, J., concurred.