[Crim. No. 3759. Fourth Dist., Div. One. Oct. 29, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES WILLIAM GIBBS, JR., et al., Defendants and Appellants.

530

**COUNSEL**

Edgar Albert Lipman, Jr., in pro. per., and J. Michael Reed, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

WHELAN, J.—Charles William Gibbs, Jr. (Gibbs) and Edgar Albert Lipman, Jr. (Lipman) appeal judgments of conviction of attempted escape from lawful custody (Pen. Code, § 4532b), possession of deadly weapons by prisoners (Pen. Code, § 4574), first degree robbery (Pen. Code, § 211) and four counts of kidnaping (Pen. Code, § 207). Lipman was found guilty of the robbery of two persons; Gibbs, of the robbery of one person. In all other respects they were convicted of the same crimes. Each was sentenced to prison and execution of the sentences was stayed as to all but one of the counts, which for Gibbs was count nine (robbery of Lane), and for Lipman count eight (robbery of Amos).

### PROCEDURAL BACKGROUND

At arraignment on October 18, 1968, appointed counsel, Mr. Ehrenfreund, who appeared with Lipman, stated Lipman desired to proceed in propria persona. Counsel was then appointed to act as a legal advisor but the record is silent as to whether Lipman was advised of his right to appointed counsel and effectively waived that right. At that time the court did not examine Lipman to determine his competence to act as his own lawyer. Both defendants pleaded not guilty to all counts.

Trial was set for December 12, 1968. On November 15, Lipman filed a motion for discovery, a separate notice of the motion, and a supporting declaration and memorandum of points and authorities.

On November 21, 1968, Lipman filed a petition before the United States District Court for removal to that court, which was denied on December 4.

Meanwhile, the motion for discovery and Gibbs' motion for severance came on for hearing on November 25 and were continued to November 26. On that date the hearing of the motions was continued without date because of the pending proceeding in the federal court.

On December 12, 1968, the case trailed. Lipman asked leave to enter a plea of not guilty by reason of insanity, which was denied.

On December 16, 1968, Lipman, in propria persona, filed a typewritten

notice of motion for dismissal under Penal Code section 995, supported by a memorandum of points and authorities.

The case was assigned for trial to Judge Glen on December 18, 1968.

Lipman appeared for trial before Judge Glen and there stated he challenged the court under Code of Civil Procedure section 170 (challenge for cause). No affidavit in support of the challenge was presented. Judge Glen told Lipman if he wished to exercise a peremptory challenge he might do so, although the district attorney might object that Lipman's right to do so had been waived. Lipman stated he wished to challenge for cause. The judge then said he would allow Lipman until 2 p.m. to prepare an affidavit. As stated by Lipman at that time, his objection to Judge Glen was that the latter at some earlier time had conducted a probation hearing on another defendant, and in a different matter, in which the probation report made unfavorable mention of Lipman.

At 2 p.m. Lipman presented a declaration under penalty of perjury, in support of his challenge, which was ordered stricken from the file by Judge Glen who denied the challenge. Lipman then said he wished to exercise a peremptory challenge. Gibbs' counsel made a statement indicating he had thought Lipman's peremptory challenge could not be made until after the challenge for cause had been made. Judge Glen denied a peremptory challenge (Code Civ. Proc., § 170.6) on the ground it had been waived by both defendants. The challenge had not been attempted before the presiding judge of the criminal department when the case was assigned for trial to Judge Glen.

Judge Glen then proceeded to deny Lipman's motion to enter a plea of not guilty by reason of insanity and Gibbs' motion for severance, and started to hear a joint motion for change of venue and a joint motion to quash the jury venire.

Judge Glen became ill before the trial and the case was thereafter assigned to Judge Mahedy who refused to declare a mistrial requested by defendants or to determine de novo some of the matters ruled upon by Judge Glen.

Evidence in support of the joint motion to quash the venire was presented anew and the motion denied. The motion for change of venue was denied with the reservation that should the *voir dire* examination disclose grounds for change of venue the motion would be reconsidered.

Judge Mahedy also denied Lipman's motion to dismiss. The judge ordered that Lipman and Gibbs, during good behavior, should not appear before the jury in irons, and that Lipman be furnished attire other than jail clothing.

STATEMENT OF FACTS

On October 6, 1968, Gibbs and Lipman were cellmates in the San Diego County jail. At about 5:45 p.m., Lipman complained to Deputy Donald Amos, who was assigned to the fourth floor where defendants' cell was located, that Lipman had cut his hand. Deputy Buford Lane, stationed on the sixth and seventh floors, was summoned and took Lipman to the dispensary. After the hand had been treated Lipman returned to the fourth floor alone. As Amos opened Lipman's cell door, Lipman stepped behind him holding a switchblade knife and removed Amos' keys and alarm signal box. While Lipman was attempting to open the door of the box housing the controls to the cells, Amos locked himself in a security well. Lipman released Gibbs and the two men disappeared in the direction of the elevator lobby.

Lewis Jackson was an inmate on October 6 and was a trusty assigned to the fourth floor. He was at the deputy station near the elevators when Lipman approached with a knife and said, "This is an escape; do you want to go with me?" Upon seeing the knife, Jackson said, "I guess I have no choice; I guess I have to go with you." Lipman and Jackson proceeded to the area of F cell-block and Lipman attempted to release another inmate but was unsuccessful. Gibbs appeared with a broken mop handle he used as a club and suggested Lipman get Amos to open the door. About that time another inmate, John Hoover, who was also a trusty, was collecting trash cans from each floor, using the elevator. On the fourth floor he took some trash cans and was looking about for others when Lipman beckoned him to come to him. Hoover refused and Lipman approached him, stuck the knife out at him and pushed Hoover along back to where the other men were waiting. Lipman and Gibbs took Jackson and Hoover with them to where Amos was locked in. Lipman finally opened the security well Amos was in and forced Amos to release Anthony Reserva. After Reserva was free, Lipman locked Amos, Jackson and Hoover in Reserva's cell and left with Gibbs and Reserva toward the deputy station.

Deputy Donald Sellers returned to the fourth floor from dinner at about 6 p.m. and as he stepped off the elevator he was confronted by Lipman, Gibbs and Reserva. Sellers attempted to press his alarm button but Gibbs, with a club raised over his head, ordered him not to do so. Gibbs then removed Sellers' alarm box. Another deputy arrived and distracted Lipman's attention, and Sellers stepped through an opened gate and locked it behind him. Sellers proceeded to a telephone and called for help, then released Amos and the two trusties. The four men armed themselves with broken mop handles and began to search for the escapees.

Lane was informed some men were going up the stairs with clubs. He

proceeded up the stairwell and found Lipman, Gibbs and Reserva on the ninth floor trying to open a door leading to the roof. Lipman forced Lane to give up his keys and alarm box and made him try to open the door. Lane was unsuccessful and the men went to the eighth floor, went through a gate to a fenced exercise area on the roof. The prisoners climbed the fence, got some tools from a shed on the roof, and were cutting a hole in the wire mesh covering the shed when they were apprehended.

## CONTENTIONS ON APPEAL

Lipman and Gibbs contend as follows:

1. The court erred in allowing Lipman to proceed in propria persona.

2. The court erred in refusing to allow Lipman to enter a plea of not guilty by reason of insanity.

3. The court erroneously ruled on the challenge for cause and the peremptory challenge.

4. It was error to deny the motion to quash the petit jury panel.

5. The convictions of kidnaping and robbery cannot stand since they were wholly incidental to another distinct offense.

6. It was error to fail to instruct on the lesser offenses included in robbery.

7. The evidence is insufficient to support the robbery convictions.

## FIRST CONTENTION

■ At the arraignment of Lipman on October 18, the following occurred:

"THE COURT: . . . How about Mr. Lipman?

"THE CLERK: Mr. Ehrenfreund?

"MR. EHRENFREUND: I was appointed [to represent Lipman], but Mr. Lipman desires to appear in pro. per. but to have me act as legal counsel during the proceedings.

"THE COURT: All right, you are appointed to consult and assist with Mr. Lipman in the preparation of this matter. Proceed."

Lipman then entered a plea of not guilty, as did Gibbs.

Mr. Ehrenfreund's statement he had been appointed to represent Lipman went unchallenged, as did his statement Lipman wished to proceed in

propria persona. That is mentioned only to show that Lipman and counsel had been in prior consultation.

The court had not, so far as the record shows up to the time Lipman appeared before Judge Glen, taken the necessary steps to establish that Lipman was competent to act in his own behalf.

When the case was called for trial before Judge Glen, the court was informed that the arraignment court had neither advised Lipman of his right to counsel nor examined his competence to defend himself. Thereupon, the court, after denying challenges to his hearing the case, performed both those tasks and allowed Lipman to continue in propria persona.

In doing so the judge established that the allegations of the indictment had previously been read to Lipman and that he understood them; that he was familiar with the indictment and had read it and talked to Mr. Ehrenfreund who also had read the indictment and who thought Lipman understood the nature of the charges against him, and that Lipman did understand their nature and the possible penalties for conviction; that Lipman had finished high school and was experienced in the way of trials and how they were handled; that since Mr. Ehrenfreund had been appointed to assist Lipman he had done so to Lipman's satisfaction; that after the judge expressed his willingness to appoint counsel for Lipman the latter desired to represent himself; that Mr. Ehrenfreund was willing to continue to advise Lipman.

The record at that point shows a clear waiver of the right to counsel. The record shows also that at every prior appearance of Lipman before the court Mr. Ehrenfreund was present.

In this court, too, Lipman has chosen to reject the offer of counsel. In his opening brief he has cited an impressive number of published decisions to a total of 83; and in his closing brief, has cited 36 decisions of the upper courts.

### SECOND CONTENTION

Lipman's motion for leave to enter a plea of not guilty by reason of insanity was first made on December 12, 1968, the date originally set for trial. The motion was denied as not timely. No reason appears why Lipman, even though ostensibly without counsel, should not earlier have attempted to enter such a plea, since when he did make the request he was still without counsel.

Under Penal Code section 1027, when such a plea is entered the court

must appoint psychiatrists to examine the defendant. That necessarily entails the passing of time, and when such a plea is entered on the day set for trial it means a delay in the trial. It is true there was a delay in the trial from other causes, but the fact that no request to enter the plea was made until the day set for trial suggests the move had been planned beforehand. That goes to the question whether good cause has been shown under Penal Code section 1016.

Lipman made a motion to enter a plea of not guilty by reason of insanity on the afternoon of December 18 before Judge Glen after witnesses had been examined in support of Lipman's motion for change of venue. Lipman stated as his grounds for the motion that he had no opportunity prior to arraignment to communicate with counsel. We have quoted matters in the record that indicate that the contrary was true.

Lipman also stated that he had not made the motion prior to December 12 because the court had for a time been ousted of jurisdiction, which was something brought about by himself.

Lipman stated no reason why he thought a plea of not guilty by reason of insanity would be appropriate.

In the discussion, Lipman said that upon his arraignment he had been advised of his right to counsel, and that he had requested to be allowed to proceed "as my own attorney."

Penal Code section 1016 provides in pertinent part as follows: "A defendant who does not plead not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense charged; provided, that the court may for good cause shown allow a change of plea at any time before the commencement of the trial. . . ."

■ The court's denial of the motion for lack of cause will normally be upheld where there was insufficient evidence tending to show defendant's claim of insanity at the time of commission of the offense is meritorious. (*People* v. *Nye,* 96 Cal.App. 186, 189 [273 P. 837]; *People* v. *Egan,* 218 Cal. 408 [23 P.2d 755]; *People* v. *Nolan,* 126 Cal.App. 623, 630-632 [14 P.2d 880].)

■ Lipman voluntarily and intelligently waived his right to counsel. He suffered no prejudice between the time of his arraignment and the time his waiver was established as a matter of record.

He failed to show good cause why he should have been allowed to enter a belated plea of not guilty by reason of insanity, and there was no abuse of discretion in the court's denial of Lipman's motion to enter such plea.

## THIRD CONTENTION

■ We have already recited the circumstances of Lipman's attempts to challenge Judge Glen for cause and then under Code of Civil Procedure section 170.6.

Lipman now disingenuously asserts that his claim of actual prejudice against Judge Glen was not because of Judge Glen's handling of a probation hearing of another person in a different proceeding in which the probation report contained unfavorable statements about Lipman as an associate of the person seeking probation. The record is replete with references to such report and of Lipman's oral statements that such was the ground of his claim of prejudice. Defendants argue it was error for the court, being challenged, to rule upon the matter.

The court denied the challenge, relying on *People* v. *Kennedy,* 256 Cal.App.2d 755, 759 [64 Cal.Rptr. 345], wherein this court held a judge is not disqualified to try a case merely because he previously, in a separate trial, heard the case of a codefendant or passed on the application of a codefendant for probation.

Code of Civil Procedure section 170 provides in pertinent part as follows: "No judge of a court of record, who shall deny his disqualification, shall hear or pass upon the question of his own disqualification; but in every such case, the question of the judge's disqualification shall be heard and determined by some other judge agreed upon by the parties . . . , or, in the event of their failing to agree, by a judge requested to act by the chairman of the Judicial Council, . . ."

Although Lipman's affidavit was not a part of the record on appeal, we have had the file of the superior court brought before us, which has in it the affidavit submitted by Lipman in support of his attempted challenge for cause. It deals wholly with the fact that Judge Glen, on July 22, 1968, had read the probation report on Dennis Floyd Luckett, and what the contents of the probation report were.

Lipman's affidavit did not state facts, as required by Code of Civil Procedure section 170, which if true show bias is probable. ■ Where the statement in the affidavit is legally insufficient, the court may ignore it or strike it from the files. (*Keating* v. *Superior Court,* 45 Cal.2d 440, 443 [289 P.2d 209].) ■ In view of the holding in *People* v. *Kennedy, supra,* 256 Cal.App.2d 755, 759, the court was justified in acting as it did.

■ Regarding the peremptory challenge, Lipman contends it was timely even though not made in the presiding department when the master

calendar was called. In that he is in error; his challenge came too late. He relies on Code of Civil Procedure section 170.5, which, although it supports his position, was repealed in 1959. The controlling statute is Code of Civil Procedure section 170.6, which provides in part as follows:

"[W]here there is a master calendar, the motion *shall* be made to the judge supervising the master calendar not later than the time the cause is assigned for trial." (Italics added.)

## FOURTH CONTENTION

 Defendants moved to quash the entire petit jury panel pursuant to Penal Code sections 1058 and 1059.

The gist of the contention is that the method of selecting trial jurors followed by the jury commissioner did not produce a true proportion of persons in defendant's economic and social class in relation to the number of such persons in the county, that there was not a geographical representation in relation to the populations of various wards and judicial districts in the county (Code Civ. Proc., § 206), and that the excuses from jury service given by the jury commissioner and deferments from service up to 30 days given by the jury clerk resulted in diluting the proportion of those of defendants' economic class.

As shown by the evidence, the method actually used to obtain names for the jury list was for the registrar of voters to obtain from the index of all voters in the county a series of regularly spaced names by a mechanical designation, such as every eleventh name, according to the ratio between the number of names requested by the jury commissioner and the total number of registered voters. That was done without relation to the different wards or judicial districts, and without regard to sex, race, color, creed, economic status, character of employment or age, except as to the age of those qualified to vote. That list, which might contain as many as 40,000 names, was then transmitted to the jury commissioner.

A superior court jury clerk composed lists of jurors to be assigned to the courts on a particular date and in doing so she was authorized and did on occasion grant deferments from service for as long as 30 days. So far as the jury commissioner was concerned, he interviewed prospective jurors regarding their qualifications to serve and certified those qualified to the court. Before certifying otherwise qualified jurors, however, he complied with a request for excuse from service where it was felt service would jeopardize the person's health or welfare or that of his family. No method of selection was used which would tend to discriminate against persons of a particular economic class, welfare recipients, or those of a certain age. There was no evidence of a systematic exclusion of any

particular occupational, economic or age group from the panel. There was no such systematic exclusion of daily wage earners as was condemned in *Thiel* v. *Southern Pac. Co.,* 328 U.S. 217, 223 [90 L.Ed. 1181, 1186, 66 S.Ct. 984, 987, 166 A.L.R. 1412]. There was direct evidence such systematic exclusions were not made.

■ Defendants had the burden of establishing intentional, systematic discrimination against persons of a certain class, economic status or geographical location. (*People* v. *Carter,* 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477]; *Ganz* v. *Justice Court,* 273 Cal.App.2d 612, 621 [78 Cal.Rptr. 348]; *Swain* v. *State of Alabama,* 380 U.S. 202 [13 L.Ed.2d 759, 85 S.Ct. 824].)

■ The excuse of a prospective juror on the ground of undue financial hardship is permissible (*Thiel* v. *Southern Pac. Co., supra,* 328 U.S. 217, 223, 224 [90 L.Ed. 1181, 1186, 1187, 66 S.Ct. 984, 987]).

■ The method of selection of a list of trial jurors from the register of voters was a reasonable compliance with the requirements of Code of Civil Procedure section 206. Such method has been found to be fair and reasonable. (*People* v. *Hess,* 104 Cal.App.2d 642, 669 [234 P.2d 65].)

Code of Civil Procedure sections 204d and 205 contemplate that the superior court and the jury commissioner, acting under the authority of the court, have discretion in selecting as potential jurors those persons who possess the necessary health, good character and intelligence.

No abuse of that discretion has been shown in denying the motion.

### Fifth Contention

■ Defendants contend both the kidnaping and robbery convictions should be reversed in that the acts upon which these convictions are based were wholly incidental to the commission of the escape and thus fall within *People* v. *Daniels,* 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225].

Lipman and Gibbs were convicted of kidnaping Amos, Lane, Hoover and Jackson.

Lipman was convicted of armed robbery of Amos and Lane; Gibbs of armed robbery of Lane. Both were convicted of attempted escape. They might have been but were not charged as aiders and abettors of the attempted escape of Reserva.

The robberies were a part of the transactions involving the attempted escapes of Lipman and Gibbs, for which both attempted escape and robbery could not be separately punished (Pen. Code, § 654). However,

they were distinct and separate crimes, the convictions for which may all stand. (*In re McCoy,* 266 Cal.App.2d 739, 740 [72 Cal.Rptr. 373].)

Our reasons for so holding are those stated hereafter in support of our conclusions that the crime of kidnaping in violation of Penal Code section 207 may be committed although the kidnaping is for the purpose of committing another crime. An example would be that of interfering with the administration of justice by abducting a witness under subpoena in a pending trial.

 There is an overlapping of and there is possible confusion between two different problems: (1) whether the crime of kidnaping in fact has occurred, or whether the forced detention and movement are only incidental to another crime for which the defendant is on trial; (2) whether a defendant may be convicted of a separate crime of kidnaping or any other crime which is committed in furtherance of yet a different crime when neither is an offense necessarily included in the other.

The accompanying diagram [see following page] shows the relationship between C cell-block and F cell-block, and may aid in an understanding of the distances traveled in the forced movements of the alleged kidnaping victims.

The tank to which Lipman was to be returned was the first tank in C cell-block. It was farthest removed from the tank in F cell-block, from which Reserva was freed.

The fourth floor of the jail was 240 feet overall from north to south and about 40 feet from east to west; however, according to Amos, the distance from the elevators to the tank in C cell-block, in which Lipman and Gibbs had been confined, was between 360 and 400 feet; and from the elevators to the tank from which Reserva was released, 15 to 20 feet.

Hoover was forced by Lipman to leave the area of the elevators and go to Reserva's cell; Lipman forced Jackson at knife-point to leave the deputy station and proceed to Reserva's cell. Thereafter Lipman and Gibbs forced Jackson and Hoover to walk to where Amos had locked himself in the security well and, after releasing Amos, forced all three back to Reserva's cell.

After Lane confronted defendants on the ninth floor, they forced him to descend the stairs to the eighth floor and from there through a gate out to a fenced exercise area on the roof. There was no testimony as to the actual distance Lane was forced to move.

. 

San Diego County Jail
Fourth Floor

Our analysis of *Daniels* and *People* v. *Williams,* 2 Cal.3d 894 [88 Cal.Rptr. 208, 471 P.2d 1008], leads to these conclusions:

A separate conviction of kidnaping is not excluded because the kidnaping was for the purpose of committing or furthering the commission of another crime, but there is no kidnaping where the forced detention and movement of the victim is only an incident to the commission of another crime, whose commission necessarily involves some detention of and may often involve some forced movement of the victim, unless there is in the forced movement a substantial increase of the risk of harm necessarily incident to the commission of the crime, or unless the victim has been moved a substantial distance from the place where the force or threat of force was first applied.

*People* v. *Williams, supra,* 2 Cal.3d 894, iterates the following language from *People* v. *Daniels, supra,* 71 Cal.2d 1119, 1139: "[T]he intent of the Legislature in amending Penal Code section 209 in 1951 was to exclude from its reach not only 'standstill' robberies (e.g., *People* v. *Knowles* (1950) *supra,* 35 Cal.2d 175 [217 P:2d 1]) but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself."

*People* v. *Daniels, supra,* 71 Cal.2d 1119, and *People* v. *Williams, supra,* 2 Cal.3d 894, have not attempted to exclude all kidnapings as the subjects of convictions where a defendant has been convicted of the crime for the purpose of which the commission of the kidnaping occurred. In other words, the conviction for kidnaping is not to be set aside merely because it was done in furtherance of the commission of another crime of which the defendant was also convicted.

■■■ An illegal purpose or an illegal intent is a requisite of any kidnaping under Penal Code section 207. (*People* v. *Oliver,* 55 Cal.2d 761 [12 Cal.Rptr. 865, 361 P.2d 593].)

Where the kidnaping is alleged to have been for the purpose of committing a specified crime under Penal Code section 209, and that crime in fact was committed, there is no problem of determining whether the detention and forced movement of the victim are incident thereto.

Where a kidnaping in violation of Penal Code section 207 is alleged, a closer scrutiny may be required to determine whether the forced detention and movement of a person are necessarily or usually involved in the commission of another crime with which the defendant is also charged, and whether they were in fact only incidental to the commission of that other crime.

*Williams* at some length discusses what is meant by being incidental to the commission of a crime. It is of value because, although Williams was charged with a violation of section 209, he was sentenced for a violation of section 207.

In that case the crime to which the forced detention and movement were held to be incidental was robbery, a crime which of necessity calls for a forced detention, however brief, of a victim. The court said, in *People* v. *Williams, supra,* 2 Cal.3d 894, 902: "[T]he movements of Murry on the gas station premises both before and after he was locked in the bathroom appear to have been brief and to have been solely to facilitate the commission of the crime of robbery. It appears that those movements were merely incidental to the commission of the robbery within the meaning of *Daniels.*"

In the case at bench there was a detention of Amos and Lane in the commission of the robberies from them. In the case of Amos that detention ceased when he slipped into the security well; and in the case of Lane, when he was forced to move from the floor where he was robbed to another floor of the jail for a different purpose.

Whether a kidnaping occurred thereafter is one of the questions to be answered. Whether the defendants might be found guilty of both attempted escape and robbery is a different question.

While in the taking of the alarm boxes and keys from Amos and Lane an assault was necessarily incident thereto, since assault is a necessarily included offense in robbery (*People* v. *Foss,* 85 Cal.App. 269, 272 [259 P. 123]; *People* v. *Allen,* 32 Cal.App. 110, 115 [162 P. 401]), there is no such necessary relationship between the forcible taking of the alarm boxes and keys and the attempted escapes in furtherance of which the takings occurred.

So that, while defendants could not be found separately guilty of robbery and of the necessarily included offense of assault, they could be found guilty of both attempted escape and robbery.

Similarly, if kidnapings in fact and law had occurred, defendants could have been found guilty of kidnaping as well as of attempted escape in aid of which the kidnaping might have occurred.

That the test is whether the one crime is necessarily included in the other is pointed out in the following language from *People* v. *Slobodion,* 31 Cal.2d 555, 563 [191 P.2d 1]: "No question would arise if defendant had been charged with rape or attempted rape and with a violation of section 288a, since there is evidence that he committed both offenses and

neither is included in the other. The same result may be reached by charging one of the offenses under section 288. Under such circumstances we are compelled to conclude that the two offenses charged in the information are separate ones, just as mayhem can be separate from rape even though it may have occurred during an episode involving rape."

Neither robbery nor kidnaping is a necessarily included offense in the crime of escape, so that those cases are irrelevant in which a defendant has been found guilty of a greater offense and its lesser included offense.

Beyond that the question would be one of multiple punishment contrary to Penal Code section 654, as appears from certain decisions which, however, may cause misunderstanding because of the use of the phrase "judgment of conviction" meaning the judgment imposing sentence, which might be confused with the finding of guilt. (See *People* v. *Logan*, 41 Cal.2d 279 [260 P.2d 20]; *Neal* v. *State of California*, 55 Cal.2d 11 [9 Cal.Rptr. 607, 357 P.2d 839][1]; *People* v. *Quinn*, 61 Cal.2d 551 [39 Cal.Rptr. 393, 393 P.2d 705].)

Whether either Lipman or Gibbs might have been subjected to separate sentences for any of their several crimes we need not discuss because neither Lipman nor Gibbs has been subjected to multiple punishment. (*People* v. *Sanders*, 250 Cal.App.2d 123, 135 [58 Cal.Rptr. 259]; *People* v. *Johnson*, 242 Cal.App.2d 870 [52 Cal.Rptr. 38]; *People* v. *Niles*, 227 Cal.App.2d 749 [39 Cal.Rptr. 11].)

The forced movements and detentions were in furtherance of the attempted escapes of Lipman, Gibbs or Reserva, or for the purpose of preventing interference in that operation.

The forced movements of Hoover and Jackson from F cell-block to C cell-block and the forced movements of those two and of Amos from C cell-block to F cell-block cannot be said as a matter of law to have been incidental to the attempted escape of Lipman and Gibbs. If incidental to any crime, they were incidental rather to the aiding and abetting in the attempted escape of Reserva, a new and independent crime with which Lipman and Gibbs were not charged.

The forcible asportation of Deputy Sheriff Lane was in aid of the attempted escapes of Lipman, Gibbs and Reserva.

---

[1]In *People* v. *Massie*, 66 Cal.2d 899, 908 [59 Cal.Rptr. 733, 428 P.2d 869], the court said: "[T]he attempted murder did not merely serve as a 'means' by which Massie sought to commit robbery, as arson served as the means of attempted murder in Neal, . . ."

In the present case all the forced movements, except as to Deputy Sheriff Lane, were on the fourth floor of the jail.

The court in *People* v. *Williams, supra,* 2 Cal.3d 894, does not seem to have applied the "substantial distance" test, but to have declared as a standard that the minimal asportation must be away from the premises where force was first exerted against the victim. The court said, at page 901: "Although the movements on the gas station premises do not appear to have been all inside an enclosure, those movements are analogous to movements inside 'a residence . . . or place of business or other enclosure' and cannot reasonably be found to be asportation 'into another part of the same county.' (Pen. Code, § 207.)"

An actual measurement of distance is mentioned only once in *People* v. *Williams, supra,* 2 Cal.3d 894, where it is said that defendant and the victim in one movement traveled 25 or 30 feet.

However, when the vastness of some modern structures is considered, it is possible that the Supreme Court would say that in certain circumstances a person might be kidnaped in a structure as large as the Pentagon in the District of Columbia, or the Empire State Building in New York, or the Los Angeles County Court House, without having been removed from the building.

In the present case Amos was forced to move a distance equivalent to one of the dimensions of most city blocks in downtown San Diego; Hoover and Jackson were forced to move about twice the distance that Amos traveled from C cell-block to F cell-block.

The forced movement of Amos took him from a place of security from which he could not have escaped without a key he did not have, and where he was not in a position to interfere with the attempted escape of Gibbs and Lipman. From that position he was forced to move to the tank in F cell-block where Reserva was confined and, there, at knife-point and under a voiced threat, forced to open the cell door and release Reserva.

The forcible movement of Amos, Jackson and Hoover was made possible by another crime directed toward each of the three victims, that of assault with a deadly weapon, with which crimes Lipman and Gibbs were not charged.

Although incidental to other crimes in the sense they were done in furtherance of such other crimes, it does not follow that the forcible detention and movement of any of the victims were necessarily incident to the crime of attempted escape in the same way as detention and, some-

times, movement of the victim are necessarily incident to robbery or rape, so as to bring the rule of *Daniels* and *Williams* into play.

The boundaries of the doctrine adumbrated in *Daniels* and *Williams* are not yet clearly defined. If we were to assume the correctness of the defendant's position, which we do not accept, that *Daniels* and *Williams* do not permit the conviction for a crime incidental to the commission of another crime in the sense of being in furtherance of such other crime, there nevertheless remain in this case questions as to the existence of the facts upon which the qualifications of the *Daniels* rule are based, i.e., the distance of the forced movements, and the substantial added risk of harm.

If we further assume that under *Williams* the forced movements all within the structure of the jail exclude a conviction of kidnaping, as to which we make no holding, the evidence here is such as to support findings of substantially increased risks of harm if that issue had been presented to the jury.

In *People* v. *Williams, supra,* 2 Cal.3d 894, 902, the court considered the question whether the movements of the victim substantially increased the risk over and above that necessarily present in the crime of robbery itself, saying that it neither appeared nor was it contended that such was the fact.

Whether the victims here were forced to move a substantial distance and whether there was a substantial increase in the amount of risk were questions of fact to be decided by the jury under appropriate instructions. Since the trial antedated the decision in *People* v. *Daniels, supra,* 71 Cal.2d 1119, the instruction given was in the language of Penal Code section 207 and was as follows: "Every person who unlawfully and forcibly steals, takes, or arrests any other person in this state, and carries him into another country, state or county or into another part of the same county, doing so against the will and without the consent of the person so carried, is guilty of kidnapping, sometimes referred to as a simple kidnapping.

"To constitute the crime of kidnapping, as charged in Counts 10, 11, 12 and 13 of the indictment there must be a carrying or otherwise forcible moving, for some distance of the person who, against his will, is stolen or taken into custody or control of another person, but the law does not require that the one thus stolen or taken be carried or moved a long distance or any particular distance."

The convictions of kidnaping resulted from instructions which in retrospect, as illumined by the decision of *People* v. *Daniels, supra,* 71 Cal.2d 1119, were erroneous.

547 at top right

We cannot say that if the jury had been properly instructed it is reasonably probable that a result more favorable to the defendants would not have been reached.

The Attorney General points out correctly that the crimes to which the forced movements of the victims were held to be incidental in *People* v. *Daniels, supra,* 71 Cal.2d 1119, were crimes against the persons and property of the same victims, and that here the crimes for the furtherance of which the two deputy sheriffs and the two trusties were forced to move were not crimes against the persons or property of those victims, but were the crimes of attempted escape by Lipman, Gibbs and Reserva.

We note, however, the language quoted in *People* v. *Williams, supra,* 2 Cal.3d 894, 902, from *People* v. *Daniels, supra,* 71 Cal.2d·1119: " 'In the present case . . . defendants had no interest in forcing their victims to move just for the sake of moving; their intent was to commit robberies and rapes, and the brief movements which they compelled their victims to perform were solely to facilitate such crimes. It follows, a fortiori, that those movements were "incidental to" the robberies and rapes within the meaning of [*Cotton* v. *Superior Court,* 56 Cal.2d 459, . . .' " and that in *Cotton* v. *Superior Court,* 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241], the court said, at page 464: "All 'asportation' in the instant case would appear to be only incidental to the assault and rioting." Rioting as such does not call for a specific victim.

Because of the disposition that we deem most appropriate in this case, we do not reach the question whether the Attorney General's argument makes the rule of *Daniels* and *Williams* inapplicable.

It should not be necessary to remand for a retrial. ▇ The crime of kidnaping necessarily includes the crime of false imprisonment effected by violence. (Pen. Code, §§ 236, 237; *People* v. *Hernon,* 106 Cal.App.2d 638 [235 P.2d 614]; *People* v. *Morrison,* 228 Cal.App.2d 707, 713 [39 Cal.Rptr. 874]; cf. *People* v. *Moreland,* 5 Cal.App.3d 588, 594 [85 Cal. Rptr. 215].)

▇ False imprisonment is the unlawful violation of the personal liberty of another. (Pen. Code, § 236; *People* v. *Zilbauer,* 44 Cal.2d 43, 51 [279 P.2d 534]; *People* v. *Agnew,* 16 Cal.2d 655 [107 P.2d 601].)

It does not require the involuntary movement of the victim from one point in space to another point in space. (*People* v. *Burrows,* 260 Cal.App. 2d 228, 230 [67 Cal.Rptr. 28]; *People* v. *Sipult,* 234 Cal.App.2d 862, 867 [44 Cal.Rptr. 846].)

A person already lawfully restrained of his personal liberty by a higher

authority may yet be unlawfully restrained within the boundaries of his place of detention by another person. "When the verdict . . . is contrary to law . . . but if the evidence shows the defendant to be . . . guilty of . . . a lesser crime included therein [the crime of which he was convicted], the court may modify the verdict . . . or judgment accordingly without . . . ordering a new trial, and this power shall extend to any court to which the cause may be appealed." (Pen. Code, § 1181, subd. 6.) (*People* v. *Kelley,* 208 Cal. 387, 392 [281 P. 609]; *People* v. *Romo,* 256 Cal.App.2d 589 [64 Cal.Rptr. 151]; *People* v. *Howard,* 10 Cal.App.2d 258 [52 P.2d 283].)

 Where there has been an error in instructing the jury, the effect of which is the rendering of a verdict of guilty of a greater offense, and where if the jury had been properly instructed a conviction of a lesser included offense might have been returned, Penal Code section 1181, subdivision 6, may be applied. (*People* v. *Brown,* 27 Cal.App.2d 612 [81 P.2d 463]; *People* v. *Simpson,* 26 Cal.App.2d 223 [79 P.2d 119].)

 The appropriate disposition will be to modify the verdicts of guilt of kidnaping to find the defendants guilty of false imprisonment effected by violence.

SIXTH CONTENTION

 Lipman and Gibbs contend it was error for the court to have failed to instruct *sua sponte* on the lesser included offense of attempted robbery. Their theory is that since they did not make good their escape the crime of robbery was not complete. In support of their argument, they quote the following: "[T]he crime of robbery is not complete until the robber has won his way to a place of temporary safety." (*People* v. *Masters,* 219 Cal. App.2d 672, 680 [33 Cal.Rptr. 383].)

The quoted language was used in *Masters* to show that one who knowingly aids robbers in their escape from the place of the robbery is a participant therein. *People* v. *Masters, supra,* 219 Cal.App.2d 672, does not hold what would be patently false, that the crime of robbery has not been committed if the robber, after having taken the property of his victim, should be apprehended at the place where the taking occurred.

Defendants also contend there were no completed robberies because they discarded the keys and alarm boxes "before attempting to complete the incident and because there was no showing of intent to permanently deprive Amos or Lane of the keys and alarm boxes." There is sufficient asportation if the property is removed from the person of the victim. (*People* v. *Smith,* 223 Cal.App.2d 431, 433 [36 Cal.Rptr. 165].)

The evidence showed that if defendants were guilty at all they were guilty of robbery and not merely attempted robbery. It is proper to refuse to instruct on lesser included offenses in such cases. (*People* v. *Thomas,* 58 Cal.2d 121, 127 [23 Cal.Rptr. 161, 373 P.2d 97]; *People* v. *Garcia,* 250 Cal.App.2d 15, 17-18 [58 Cal.Rptr. 186].)

### SEVENTH CONTENTION

Defendants contend the robbery convictions may not stand because the evidence showed the keys and alarm boxes were discarded within the jail and thus there was no proof they intended permanently to deprive Amos and Lane of them.

The specific intent to steal need not be directly proved, but may be inferred from all the circumstances of the case. (*People* v. *Hall,* 253 Cal. App.2d 1051 [61 Cal.Rptr. 676].) Here the fact that the keys and alarm boxes were taken by threats of violence and the fact that they were not recovered until the escape had been thwarted permitted a reasonable inference that defendants had the requisite intent.

We find that neither defendant has been deprived of his Sixth Amendment right to counsel either in the trial court or on this appeal; nor has either been deprived of his right to trial by a fair and impartial jury; that neither has been deprived of due process or the equal protection of the laws in respect of the place of trial, or in respect of the composition of the jury panel.

The separate verdicts finding Gibbs and Lipman guilty as to the tenth, eleventh, twelfth and thirteenth counts are modified and the separate judgments entered thereon as to each of said defendants are modified so as to find Lipman and Gibbs guilty under each of said counts of false imprisonment effected with violence. In all other respects the judgments are affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied November 13, 1970.